**TABER PARTNERS I, Plaintiff,**

**v.**

**INSURANCE COMPANY OF NORTH AMERICA, INC., Defendant.**

**MERIT BUILDERS, INC., Defendant, Counterclaimant, and Third–Party Plaintiff,**

**v.**

**VICTOR TORRES & ASSOCIATES,**

**and**

**Desarrollos Metropolitanos, Inc., Third–Party Defendants.**

Civ. No. 91–1220 (JP).

United States District Court, D. Puerto Rico.

July 8, 1992.

Rubén T. Nigaglioni, Ledesma, Palou & Miranda, Hato Rey, P.R., for plaintiff.

Harvey B. Nachman, Nachman & Fernández Seín, Santurce, P.R., for defendant.

Edilberto Berríos Pérez, Hato Rey, P.R., for Víctor Torres.

Humberto Guzmán Rodríguez, Fiddler, González & Rodríguez, San Juan, P.R., for Desarrollos.

## OPINION & ORDER

PIERAS, District Judge.

The Court has before it the Motion to Dismiss filed by third-party defendant Desarrollos Metropolitanos, Inc. (hereinafter "Desarrollos") on March 12, 1992, and the supplemental Motion to Dismiss filed by third-party defendant Víctor Torres and Associates ("VTA") on April 1, 1992. For the reasons set forth below, the motions are hereby GRANTED.

## I. Factual and Procedural Background

Plaintiff Taber Partners I ("Taber") is a New York General Partnership whose only partners are two Subchapter S corporations incorporated in New York—Lerfer San Juan Corporation ("Lerfer"), which holds a ninety nine percent (99%) interest in Taber, and Calumet Corporation ("Calumet"), which holds a one percent (1%) interest in Taber. Taber is the owner and operator of the Ambassador Plaza Hotel & Casino ("Ambassador Plaza") in Condado, Santurce, Puerto Rico. Defendant Merit Builders, Inc. ("Merit") is a corporation organized and existing under the laws of Puerto Rico. Beginning in January 1989, Taber and Merit entered into a series of construction contracts for renovations and expansion of the Ambassador Plaza. Taber brought this action seeking recovery of damages caused by alleged delays, substandard workmanship, and loss of profits resulting from alleged breaches of contract, fraud, and negligence by Merit. Merit filed a counterclaim which seeks recovery on the contracts and for the alleged destruction of its ability to operate in the marketplace. The jurisdiction of this Court is predicated on diversity of citizenship. *Accord* 28 U.S.C. § 1332. Merit filed third-party complaints against VTA, Taber's inspecting architect, asserting that they conspired with Taber to officially deny substantial completion of the projects, and Desarrollos, the subcontractor hired to build the basic structures, asserting that it is entitled to indemnification under the subcontract agreement for any damages sustained by Taber as a result of Desarrollos' improper construction.[1]

Desarrollos and VTA seek dismissal of this action on grounds that this Court is without subject matter jurisdiction because diversity of citizenship between Merit and Taber does not exist. These motions were filed on the eve of trial, after months of extended and costly discovery; however, Rule 12(h)(3) of the Federal Rules of Civil Procedure provides that *"[w]henever* it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action" (emphasis added). *Cf.* Rule 12(c) (other non-waivable jurisdictional defenses may be brought to the court's attention after the time for filing motions to dismiss has passed by way of a motion for judgment on the pleadings, but such motion must be made "within such time as not to delay the trial.") The motions have been opposed by both the plaintiff *and* the defendant, who argue that diversity exists between them; however, as Judge Selya noted in a similar context, "subject matter jurisdiction is a bit like pregnancy; it either exists or it does not. If the latter, jurisdiction cannot be conferred by agreement or concession of the parties." *Northeast Federal Credit Union v. Neves,* 837 F.2d 531, 532 n. 2 (1st Cir.1988) (citations omitted). Given the complicated issues presented on these motions, the Court finds it unfortunate that Judge Selya's colorful analogy cannot be extended so that the Court might, instead of having to sift through these difficult issues, simply wait nine months to see how everything turns out.

The material facts underlying the jurisdictional issues raised by movants are not in dispute. In 1986, Mr. F. Eugene Romano and Ms. Linda E. Romano, both citizens of New York, incorporated Lerfer and Calumet in New York. Mr. Romano owns all the outstanding shares of Lerfer, in exchange for which he paid $479,300.00. He acts as its president and treasurer. Ms. Romano owns all the outstanding shares of Calumet, in exchange for which she paid $300.00. She acts as its president and treasurer. The directors of both Lerfer and Calumet are Mr. Romano, Ms. Romano, and Mrs. Jeanne Romano. Mrs. Jeanne Romano serves as secretary for both corporations.

Both Lerfer and Calumet are Subchapter S corporations under 26 U.S.C. § 1361 et seq. and New York Tax Law § 660(a) (McKinney's 1987). Both have their headquarters at 501 Main Street, Utica, New

---

1. Defendant Insurance Company of North America ("INA") furnished to Taber a Performance Bond to guarantee Merit's faithful performance of its obligations pursuant to the contract between Taber and Merit for the construction of a new hotel tower.

York. Both file federal income tax returns from New York and state income tax returns in New York. Neither files income tax returns from or in Puerto Rico.[2] Both maintain their corporate books in New York. Both have entered into contracts establishing bank accounts, lending and borrowing money, and establishing working capital accounts in New York. The Certificates of Incorporation of both Lerfer and Calumet contain general declarations that their purpose is to engage in all lawful acts or activities under New York law.

Lerfer and Calumet entered into a partnership agreement that formed Taber. The agreement delegated operation of the partnership to an executive director, Mr. Romano, and an assistant director, Ms. Romano. It also granted the partnership the authority to borrow money, enter into contracts and "do any and all other acts necessary or proper in the furtherance of the partnership business." Agreement at § 4.04. Taber's business is the operation and management of the Ambassador Plaza.

## II. Discussion

### A. *Controlling Legal Principles*

District courts have original jurisdiction over all civil actions in which the amount in controversy exceeds $50,000.00 and the dispute is between "citizens of different States." 28 U.S.C. § 1332(a)(1). Once jurisdictional allegations are challenged, the party asserting diversity has the burden of establishing the allegations with competent proof. *Media Duplication Services v. HDG Software*, 928 F.2d 1228, 1235 (1st Cir.1991) (citing *Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942); *Topp v. CompAir Inc.*, 814 F.2d 830, 839 (1st Cir.1987); *de Walker v. Pueblo International, Inc.*, 569 F.2d 1169, 1172 n. 4 (1st Cir.1978)).

The Supreme Court has held that general partnerships, like Taber, as well as other types of unincorporated associations, are not "citizens" for purposes of jurisdiction under Section 1332. *Accord Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900); *Chapman v. Barney*, 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889). To determine the citizenship of such entities for diversity purposes, the citizenship of their constituent partners or members must be consulted. *Accord Carden v. Arkoma Associates*, 494 U.S. 185, 195–96, 110 S.Ct. 1015, 1021, 108 L.Ed.2d 157 (1990) (citations omitted) (". . . diversity jurisdiction in a suit by or against the [unincorporated] entity depends on the citizenship of 'all the members,' 'the several persons composing such association,' 'each of its members.' ") In this case, therefore, the citizenship of Taber can be established by considering the citizenship of Lerfer and Calumet.

Pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principle place of business." *See also* 28 U.S.C. § 1332(d) (the word "state" in Section 1332 includes the Commonwealth of Puerto Rico). The movants acknowledge that Lerfer and Calumet are incorporated in New York but argue that their principle place of business is in Puerto Rico, thereby establishing dual citizenship for both corporations and defeating diversity jurisdiction in this case. *See Chemical Transporta-*

**2.** The laws of Puerto Rico view Taber as "special partnership" under the Special Partnership provisions of Supplement P of the Puerto Rico Income Tax Act of 1954 ("PRITA"), as amended by Act No. 8 of July 19, 1985. Pursuant to Supplement P of PRITA and the regulations thereunder, particularly Regulation No. 3369 dated November 4, 1986 (entitled "Amendment and Additions to the Regulations Pertaining to the Income Tax Act of 1954, as Amended, Approved on July 11, 1957, to Regulate All Relative to the Tax Treatment of Special Partnership and its Partners"), the partners of a special partnership are not considered or deemed to be doing

business in Puerto Rico. As a result, neither Lerfer nor Calumet is required to file income tax returns in Puerto Rico.

Pursuant to a Resolution dated August 21, 1989, issued by the Governor of the Commonwealth of Puerto Rico, Taber enjoys a tax exempt status under the Puerto Rico Tourist Incentive Act of 1983, Act No. 52 of June 2, 1983, 23 L.P.R.A. § 693, *et seq.* Pursuant to 23 L.P.R.A. § 693c(b), Mr. Romano and Ms. Romano, as share-holders of Lerfer and Calumet, are considered separately as if they were the partners of Taber and are therefore also exempt from Puerto Rico tax.

*tion Corp. v. Metropolitan Petroleum Corp.*, 246 F.Supp. 563 (S.D.N.Y.1964) (the purpose of Section 1332(c)(1), which gives dual, not alternative, citizenship to a corporation whose principal place of business is located in a state different from the state of its incorporation, is to restrict the diversity jurisdiction of the federal courts).

Several techniques can be used to establish the principle place of business of a corporation. In *Topp v. CompAir Inc.*, 814 F.2d 830 (1st Cir.1987), the First Circuit explained:

> This court has recognized that there are three distinct, but not necessarily inconsistent tests for determining a corporation's principal place of business. *de Walker v. Pueblo International, Inc.*, 569 F.2d 1169, (1st Cir.1978). One is the "nerve center" test which searches for the location from where the activities of the corporation are controlled and directed, *Lugo–Vina v. Pueblo International, Inc.*, 574 F.2d 41, 43 (1st Cir.1978). The other two tests are the "center of corporate activities" test, *i.e.*, where the corporation's day-to-day management takes place, *de Walker*, 569 F.2d at 1172; *Kelly v. United States Steel Corp.*, 284 F.2d 850, 854 (3d Cir.1960); and the "locus of the operations of the corporation" test, *i.e.*, where the bulk of the corporation's actual physical operations are located, *Inland Rubber Corp. v. Triple A Tire Service, Inc.*, 220 F.Supp. 490 (S.D.N.Y. 1963)....

The nerve center test was developed in the context of corporations with "complex and farflung activities." *de Walker*, 569 F.2d at 1172. *See Scot Typewriter Co. v. Underwood Corp.*, 170 F.Supp. 862 (S.D.N.Y.1959). The nerve center is described as "the center of gravity ..., the place where most of the higher officers maintained offices, where the policy decisions were made, where the administrative departments were located, and where the last income tax return has been filed." 1 *Moore's Federal Practice* ¶ 0.77[3.–2], at 717.67 (2d ed. 1986).

In *Lugo–Vina* we acknowledged that the nerve center test may be appropriate in respect to a holding company, 574 F.2d

at 43 n. 2, because the test was developed for cases involving corporations with complex and farflung activities where only the nerve center can truly be termed the principle place of business. *Id.* at 43.

*Topp*, 814 F.2d at 834 (1st Cir.1987); *see also id.* at 835 n. 4 (emphasis in original) ("what is sought ... is the operational center of the corporation in question, *giving proper regard to the corporate identity* ").

Since *Topp*, a fourth test has emerged, the "total activities" test, which was developed by the Fifth Circuit and has been recognized in this district. *See, e.g., Zavala v. G.D. Searle & Co., Inc.*, Civil No. 90–1747 (PG), 1991 WL 128222 (citing *J.A. Olson Co. v. City of Winona*, 818 F.2d 401 (5th Cir.1987)). The total activities test is "the union of the 'nerve center test' and the 'corporate activities test.' " *Id.* It takes each of the factors considered under these two tests into account, although different factors are given varying weight in different contexts. The total activities test thus operates based on a series of guidelines:

> (1) when considering a corporation whose operations are far flung, the sole nerve center of that corporation is more significant in determining principle place of business; (2) when a corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more significant; but (3) when the activity of a corporation is passive and the "brain" of the corporation is in another state, the situs of the corporation's "brain" is given greater significance
>
> ....

*J.A. Olson*, 818 F.2d at 411 (citations omitted).

**B. *Subchapter S Corporations***

Before applying these tests to Lerfer and Calumet, one must understand the effect of their status as Subchapter S corporations. This requires an understanding of the nature and purposes of Subchapter S corporations.

In 1958, Congress established the Sub-chapter S corporation to provide taxpayers with a vehicle to obtain the financial benefits of a corporation without bearing the costs of double taxation. *Accord* Sommerfeld, Anderson & Brock, *An Introduction to Taxation* at 11–8 (1983 ed.). The result is "a tax hybrid—part corporation, part partnership." *Id.* In a S corporation, a conduit system allows profits to flow through the corporate entity so that shareholders report the corporation's taxable income or loss on their individual tax returns in a manner similar to that of partnerships and partners. Traum & Traum, *The S Corporation Answer Book* at 1 (1988). As a result, earnings are not taxed as income at the corporate level. Instead, they are taxed only on the distribution to shareholders, who pay taxes on a pro rata share of the entity's income. This elimination of double taxation is perhaps the greatest advantage of the S corporation over a regular or "C" corporation.[3]

To be eligible to make an S corporation election, a corporation must be a "small business corporation"—that is, it must have (i) no more than 35 shareholders; (ii) shareholders who are either individuals, estates, or certain types of trusts; (iii) no nonresident alien as a shareholder; and (iv) no more than one class of stock. 26 U.S.C. § 1361(b)(1). It must also be a domestic corporation that is not otherwise "ineligible." I.R.S.Prop.Reg. § 1.1261–1A(c) (Oct. 7, 1986) (ineligible corporations include those that are members of affiliated groups, certain financial institutions, certain insurance companies, corporations to which an election under Section 936 concerning Puerto Rico and possession tax credits applies, and domestic international sales corporations). A corporation's S status will be lost if any of these limitations are violated or if its passive investment income exceeds 25 percent of gross receipts for three consecutive taxable years and it has subchapter C earnings and profits. 26 U.S.C. § 1362(d)(3).

In addition to the advantages of an S corporation over a C corporation,[4] the form also has various advantages over a partnership. For example, it can provide an opportunity for participation in management to all investors, which is denied to limited partners seeking to protect their limited liability status. Its shares can be freely transferred. It has an unlimited continuity of life. And the liability of all investors is limited, not just that of limited partners. Fass & Gerrard, *The S Corporation Handbook* § 3.01[2] (1991–92 ed.) These advantages have generated increasing interest in the use of the S corporation form either as an alternative to C corporations and partnerships or with other entities to achieve the desired blend of limited liability, participation in management, allocation of tax attributes, and single-level taxation on earnings. *Id.* § 1.01[6]. In 1985, approximately 75,000 S corporation elections were made. For 1992, the IRS projects that almost 1,014,000 S returns will be filed, representing 22 percent of the projected corporate returns for the year. *Id.* § 1.01.

One effective way in which to use an S corporation is as the plaintiffs have—in conjunction with a limited partnership. One commentator has explained:

> It appears that an S corporation as a general partner in a limited partnership, *or several S corporations in partnership*, can be effectively utilized to overcome the disadvantages inherent in the limited partnership and S corporation entities when taken individually. For example, these arrangements can: produce limited liability for all members of the partnership; provide special allocations among investors; accommodate later

---

**3.** Other advantages include avoidance of the corporate alternative minimum tax provisions, possible avoidance of the limitation on passive losses, and avoidance of the accumulated earnings tax. Fass & Gerrard, *The S Corporation Handbook* §§ 1.01[3]–1.01[5] (1991–92 ed.).

**4.** One disadvantage that S corporations have in comparison to C corporations is the reduced availability of fringe benefits. In dealing with such benefits, S corporations are treated like partnerships with any shareholder who owns more than 2 percent of the stock treated as a partner. As a result, these expenses are not deductible at the corporate level. *Id.* § 3.02[7][a].

break-up or separation of the business; protect S corporations from the tax on excess passive investment income; allow for otherwise impermissible investors (e.g., nonresident aliens and certain trusts); escape the passive loss limitation rules; and plan for estate freeze potential.

*Id.* § 3.04 (emphasis added).

### C. Views of the Parties

The bedrock assertion of both Taber and Merit is that the only "business activity" of Lerfer and Calumet—which they allege were incorporated for the purpose of acting as subchapter S corporations and mere investment vehicles—is to administer and hold their respective interests in Taber, which administration consists of monitoring the records, accounts, and finances of the corporations—activities which occur exclusively in New York. They contend that Taber's activities are irrelevant to the determination of the principle place of business of Lerfer and Calumet and that "the

correct inquiry focuses on Lerfer and Calumet and their principle places of business as holding companies, rather than the alleged activities of Taber." Plaintiff's Memorandum of Law at 12. They assert based on this narrow view of the operations of Lerfer and Calumet that the corporations must be viewed as having their principle places of business in New York.[5]

Desarrollos and VTA respond that in reality the "business" of both Lerfer and Calumet is the management and operation of the Ambassador Plaza. They assert that the only business purpose of both corporations is the administration of their respective interest in the Ambassador Plaza, which is the only real asset of both corporations as well as their most substantial investment. They then attempt to impute to the corporations all of the activities of the partnership in Puerto Rico, which are substantial. Based on this analysis, they assert that the corporate purpose of both Lerfer and Calumet is therefore fulfilled in Puerto Rico.[6]

**5.** Taber and Merit differ somewhat as to how the tests set forth in Part II.A. should be applied to yield such a conclusion. Taber argues that the nerve center test alone is controlling in this case and that application of any other test to holding companies like Calumet and Lerfer would contravene the directives of the First Circuit in *Topp*. Taber asserts that despite suggestions that application of the nerve center test is confined to companies with "far flung" operations, the test is appropriately applied to corporations engaged in "passive activity that—unlike manufacturing, buying and selling—provides for negligible contact with the public." 1 *Moore's Federal Practice* ¶ 0.77[3.–2] (2d ed. 1992). Applying the factors set forth in *Topp* for determining the nerve center of a corporation (*accord* 814 F.2d at 830), Taber argues that since it is in New York that (i) the corporate headquarters of both Calumet and Lerfer are located, (ii) both corporations file their tax returns, (iii) their corporate records and bank accounts are located, (iv) personnel who administer the corporations are located, and (v) meetings of their boards of directors are held, New York must be considered the principle place of business of both corporations.

Merit, on the other hand, believes that the nerve center test operating independently is more appropriately applied to large corporations with far-flung activities. It also believes that the locus of operations test is inapplicable to Lerfer and Calumet because it focuses on the place where the bulk of the corporation's actual

physical operations are located and Lerfer and Calumet have no physical operations. Merit argues that the corporate activities test *could* be applied to Calumet and Lerfer—and if applied would point to New York as the "headquarters of day-to-day corporate activity and management" (*Kelly v. United States Steel Corp.,* 284 F.2d 850, 854 (3d Cir.1960)) of both corporations—but feels that this test alone is not sufficient in analyzing the principal place of business of Lerfer and Calumet. Merit asserts instead that the total activities test should be applied in this case. Merit then argues that all three of the total activities factors point to New York as the principle place of business of both corporations: the nerve center of both corporations is in New York; the "activities" of both corporations occur in New York since their only function is to act as S corporations for Mr. and Ms. Romano; and the situs of the "brain" of both corporations is in New York. Merit contends that this last factor should be considered more significant since Calumet and Lerfer are primarily involved in passive investment.

**6.** Desarrollos, for reasons similar to those of Merit, asserts that the total activities test should be applied to resolve this issue. Unlike Merit, however, Desarrollos suggests that the Court should follow guideline two of the test and give primary weight to the place of activity of Lerfer and Calumet. Desarrollos brings forth a long list of facts which support its characterization of the business of both corporations and its asser-

### D. *Preliminary Considerations*

The Court must determine the nature of the relationship between Lerfer and Calumet on the one hand and Taber on the other. This is a difficult task. Before tackling it, the Court pauses to set forth a few preliminary considerations.

First, the Court rejects outright the narrow view of Lerfer and Calumet suggested by Merit and Taber. They consistently refer to the entities as "subchapter S corporations" as though this designation conclusively defines the contours of their business and purposes; however, viewed in this narrow fashion, there are no such creatures as "subchapter S corporations." Instead, there are only corporations which have made an *election* under subchapter S of the Internal Revenue Code to receive certain tax treatments. As seen in Part II.B. of this Opinion, this election only affects a corporation's and shareholder's tax liability; it does not alter the fundamental business of a corporation. *Accord* 1 C. Keating & G. O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 36 at 576 (1990 rev'd vol.) (citing *Hadden v. City of Gatlinburg*, 746 S.W.2d 687 (Tenn.1988)). The Court therefore rejects the notion that the *only* business purpose of Lerfer and Calumet is to administer and hold their respective interests in Taber.

The Court is tempted to resolve this matter based solely on this conclusion. Lerfer and Calumet were incorporated to assist the Romanos in purchasing and controlling the Ambassador Plaza. Taber and Merit have attempted to sever this purpose from the corporations by pointing to the partnership that the corporations subsequently formed—whose day-to-day responsibilities involve the management of the hotel—and claiming that the partnership is a wholly distinct entity whose activities cannot be attributed to the partner corporations—which in turn would not exist absent the activities of the partnership. It cannot be denied that the *sine qua non* of the corporations is the operation of the hotel. Such is Desarrollos' view of this issue. The Court, however, is uncomfortable with such a disposition for the following reasons.

Subchapter S corporations like Lerfer and Calumet are legitimate creations provided for by federal and state law. In addition, the partnership created between the two corporations is a legitimate venture. The Romanos' purpose in structuring its business using these entities was to avail itself of tax and liability advantages provided for by law—not to manipulate citizenship for purposes of diversity jurisdiction. If a by-product of the structure chosen is that a straightforward application of controlling caselaw suggests that federal jurisdiction lies in this case, perhaps the Court should ignore its other concerns. Such is Merit's and Taber's view of the issue. The Court is equally uncomfortable with this conclusion, however, because for several reasons it is not possible to effectuate a straightforward application of controlling caselaw to this issue.

Considerations of the interrelationships between corporations, or between corporations and other related forms, cut across a series of related issues, including corporate liability, personal jurisdiction, and, as here, corporate citizenship. Moreover, although each of these issues requires consideration of a different group of factors, much of the

---

tion that the corporate purpose of both corporations is fulfilled in Puerto Rico. Most of these facts are intended to show that the business of the corporations and the partnership is indistinguishable. For example, the purpose of incorporating both corporations was to serve as owners of the Ambassador Plaza; the corporations are co-owners of the Ambassador Plaza property; and the shareholders of the corporations are the managers of the partnership. The other facts set forth by Desarrollos indicate more directly that the primary business of the corporations has occurred in Puerto Rico. For example, the two major transactions which the corpo-

rations have entered into have been (i) to authorize the formation of Taber through a meeting of its board of directors in San Juan and (ii) to authorize Taber to execute a Bond Purchase Agreement, Loan Agreement, and Letter of Credit Agreement to obtain AFICA financing in the amount of $27,650,000.00 through a meeting which also occurred in San Juan. Desarrollos then concludes that since Taber's single operating activity occurs in Puerto Rico, the principal place of business of both Lerfer and Calumet is also Puerto Rico.

VTA's contentions are virtually identical to those of Desarrollos.

ground overlaps. As Judge Selya has pointed out in the context of piercing the corporate veil, "[w]hile it is generally true that questions of '[l]iability and jurisdiction are independent,' the factors that we must consider ... in the liability context also inform the jurisdictional inquiry." *United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1091 (1st Cir.1992) (hereinafter *UERMWA*) (citations omitted). More significantly, the tests used to determine the citizenship of corporations and partnerships, which can be difficult to apply in isolation, appear unhelpful where, as here, they must be applied simultaneously. The Court is therefore mindful of Judge Selya's warning in another related context that in situations of this sort "the seductive appeal of rigid stratification must yield to a frank appraisal of the realities surrounding any given relationship." *Donatelli v. National Hockey League*, 893 F.2d 459, 468 (1st Cir. 1990).

### E. *Analysis*

 Having dispensed with these preliminary considerations, the Court finds that, because Lerfer and Calumet do not engage in complex and far-flung activities, the total activities test is most appropriately applied to determine their principle place of business. *Accord American/Caribbean Development, Inc. v. Lincoln American Corporation*, slip op. no. 90–2289 (PG) at 13–14 ("[Defendant] is not a company with 'complex and far-flung activities.' Therefore, neither the nerve center, the center of corporate activities nor the locus of operations tests seem appropriate tests to apply.") Of all of the established test, only the total activities test provides a sufficiently realistic, flexible, and nonformalistic approach, which is necessary to effectuate an appropriate balancing of all the factors

to be considered in this case. ·*See J.A. Olson, supra*, 818 F.2d at 412.

 The Court therefore considers the dual prongs of the total activities test: nerve center and center of corporate activities. Applying the factors set forth by the First Circuit in *Topp*, the Court finds that the nerve center of both corporations is located in New York, since it is the location of their corporate headquarters, principal bank accounts, corporate records, and corporate personnel, as well as the state from which they file income tax returns and which they have designated in corporate documents as the location of their corporate headquarters. *Accord Topp, supra*, 814 F.2d at 837–88. Conversely, the Court finds, based on its conclusion that the dominant business of both Lerfer and Calumet is their interest in the Ambassador Plaza, that the center of corporate activities of both corporations is located in Puerto Rico.

The Court must therefore determine which of these two factors should be given more weight in this case under the guidelines set forth in *J.A. Olson*. Desarrollos contends that guideline two—when a corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more significant—controls. *Accord North Star Hotels v. Mid–City Hotel Associates*, 696 F.Supp. 1265 (D.Minn.1988) (citing *Hanna Mining Co. v. Minnesota Power & Light Co.*, 573 F.Supp. 1395 (D.Minn.1983), *aff'd*, 739 F.2d 1368 (8th Cir.1984) ("when virtually all of the corporate business in conducted in one state but the headquarters and corporate-policymaking functions are located in another, the situs of the corporate business assumes greater importance.")) Merit contends that guideline three—when the activity of the corporation is passive and the brain of the corporation is in another state, the situs of the corporation's brain is given greater significance—controls.[7]

---

**7.** Merit directs the Court's attention to *Village Fair Shopping Center v. Sam Broadhead Trust*, 588 F.2d 431 (5th Cir.1979), which involved a similar dispute and was decided by resort to guideline three. Plaintiff sought a declaratory judgment in federal court regarding amounts due under certain lease agreements. Defendants challenged plaintiff's allegation of diversi-

ty of citizenship, arguing that Mississippi was the principle place of business of M.L. Enterprises, Inc., a partner in the plaintiff company, a consortium operating the Village Fair Shopping Center in Lauderdale County, Mississippi. The undisputed evidence showed that M.L. Enterprises was a real estate and general trading company incorporated in Delaware with its only

The Court accepts Desarrollos' contention and applies guideline two. For the same reasons set forth in Part II.B. of this Opinion, the Court rejects the contention of Merit and Taber that Lerfer and Calumet are only engaged in passive investment activity. Only a unrealistically narrow view of the orientation of the corporations and their partnership could yield such a conclusion. The corporations were formed to act as owners of the Ambassador Plaza. They devote almost all of their corporate activity to administer their assets in the partnership. They actively authorized the formation of Taber and the obtaining of a bond to assist in the financing of the projects. They have loaned substantial amounts of money to Taber. And the directors of the partnership, Mr. and Ms. Romano, are the directors of the corporations. Under these circumstances, the Court cannot accept the characterization of the corporations' interests in Taber as passive. The Court therefore considers of greater significance the location of the corporations' primary activity. This activity is the renovation and operation of the Ambassador Plaza, which is located in Puerto Rico.

III. Conclusion

The Court thus finds that the principal place of business of both Lerfer and Calumet is in Puerto Rico; that the domicile of Taber is located in Puerto Rico; that diversity of citizenship does not exist in this case; that the motions to dismiss filed by Desarrollos and VTA must be GRANTED; and that this case must be DISMISSED for lack of subject matter jurisdiction pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

office in New York. Both officers of the corporation, and two of its three shareholders, resided in New York. The corporation had no salaried employees. At the time of the lawsuit, the corporation had only three investments: $250,000.00 in the Mississippi shopping center; $125,000.00 in a shopping center in California; and $400,000.00 in short-term commercial paper and bank accounts in New York. All decisions on behalf of the corporation were made in New York. New York was designated as the corporation's principle place of business for tax purposes. And, aside from its interest in the shopping center, the corporation's only other contact with Mississippi was the fact that it was qualified to do business in the state.

The trial court found that despite the fact the corporation's business was conducted in New York, "its activities [were] actually motivated by the ultimate accomplishment of its largest single tangible property in Lauderdale County, Mississippi." 588 F.2d at 433. The circuit court, which did not question the trial court's methodology, nonetheless rejected its conclusion about the interests of the corporation. The court explained:

> The corporation is obviously interested in its single largest equity investment; however, there is no evidence to show that this property requires even a proportionate share of the attention of the corporate affairs. Since the property was purchased, the officers have paid almost no attention to it.
>
> In contrast, the activity in New York is far more significant and is thus determinative of the corporation's principle place of business.

For no apparent reason, the trial court discounted the sizable assets held by the corporation in New York in the form of short-term commercial paper and bank accounts. While it is true that the largest single piece of realty owned by the corporation is the Mississippi shopping center, the tangible assets in New York have greater aggregate value than the Mississippi property. In addition, the trial court failed to give any weight to the frequent activity occurring exclusively in New York in connection with the management and investment of the short-term commercial paper.... The single passive investment in the Mississippi shopping center should not of itself outweighed all of the other factors we have mentioned in the determination of the company's principle place of business.

*Id.* at 434 (citations omitted). Merit contends that this case is directly on point and dictates a similar conclusion that the single passive investment of Lerfer and Calumet in Puerto Rico cannot outweigh all of the factors indicating that the principle place of business of the two corporations is New York.

The Court rejects Merit's contention. The only connection that either Lerfer or Calumet has in New York, aside from matters relating to corporate formalities, are bank accounts and working capital accounts maintained in New York. In contrast to *Village Fair,* in which similar accounts constituted a significant part of the corporation's investment activity, in this case the accounts maintained by Lerfer and Calumet are dwarfed by their respective interests in Taber. *See, supra,* note 6.