USCA1 Opinion

 

 March 3, 1993 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-1921 TABER PARTNERS, I, A NEW YORK GENERAL PARTNERSHIP, Plaintiff, Appellant, v. MERIT BUILDERS, INC., A PUERTO RICO CORP., ET AL., Defendants, Appellees. _____________________ No. 92-1922 TABER PARTNERS, I, A NEW YORK GENERAL PARTNERSHIP, Plaintiff, Appellee, v. MERIT BUILDERS, INC., A PUERTO RICO CORP., Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, Jr., U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, and ____________________ Stahl, Circuit Judge. _____________ ____________________ Harvey B. Nachman with whom Joan Schlump Peters was on brief for _________________ ____________________ Merit Builders, Inc. and Arch Stokes with whom John R. Hunt, Stokes ___________ _____________ ______ and Murphy, Ruben T. Nigaglioni and Ledsma, Palou & Miranda were on __________ ___________________ _______________________ brief for Taber Partners I. Jay A. Garcia-Gregory with whom Rafael R. Vizcarrondo, Humberto ______________________ _____________________ ________ Guzman-Rodriguez and Fiddler, Gonzalez & Rodriguez were on brief for ________________ ______________________________ appellees. ____________________ March 3, 1993 ____________________ STAHL, Circuit Judge. This appeal requires us to ______________ decide whether, for purposes of diversity jurisdiction, a partnership's business activities should be considered in determining the principal place of business of each of its corporate partners. We hold that, in the absence of evidence that the partnership and its corporate partners failed to maintain their separate identities, the partnership's activities ordinarily should not be considered for this purpose. I. I. __ PROCEDURAL POSTURE PROCEDURAL POSTURE __________________ Plaintiff Taber Partners I ("Taber"), a New York general partnership whose sole partners are two New York corporations, Lerfer San Juan Corp. ("Lerfer"), and Calumet Corp. ("Calumet"), owns and operates the Ambassador Plaza Hotel & Casino ("Hotel") in San Juan, Puerto Rico. Defendants Merit Builders, Inc., and Merit Builders, S.E. (hereinafter referred to collectively as "Merit") are Puerto Rico-based construction companies. Beginning in March 1988, Taber and Merit entered into a series of consulting and construction contracts involving the renovation and expansion of the Hotel. Disputes arose during the course of the project, and in February 1991, Taber commenced a diversity action against Merit in the United States District Court for the District of Puerto Rico asserting, inter alia, breach of _____ ____ -2- 2 contract, fraud, and negligence. Merit responded with several counterclaims against Taber and filed third-party complaints against appellees Victor Torres & Associates ("VTA"), the inspecting architect, and Desarrollos Metropolitanos, Inc. ("Desarrollos"), one of the project subcontractors. Like Merit, both VTA and Desarrollos are citizens of Puerto Rico. On the eve of trial, VTA and Desarrollos moved to dismiss, asserting that -- because Taber was also a citizen of Puerto Rico -- diversity of citizenship was lacking. As the citizenship of Taber depends upon the citizenship of its partners, Lerfer and Calumet, the district court first had to determine Lerfer's and Calumet's citizenship. See Carden v. ___ ______ Arkoma Assocs., 494 U.S. 185, 195-96 (1990) (reaffirming the ______________ "oft-repeated rule that diversity jurisdiction in a suit by or against [a partnership] depends on the citizenship of `all the [partners]' . . .") (quoting Chapman v. Barney, 129 U.S. _______ ______ 677, 682 (1889)). As Lerfer and Calumet are both incorporated in New York, the sole issue before the district court was the principal place of business of both corporations. See 28 U.S.C. 1332(c)(1) ("For the purposes ___ of [diversity,] . . . a corporation shall be deemed to be a citizen of any [s]tate by which it has been incorporated and ___ of the [s]tate where it has its principal place of business") (emphasis supplied). The district court ultimately -3- 3 agreed with VTA's and Desarrollos' argument that the principal place of business of both Lerfer and Calumet was Puerto Rico. Thus, on July, 8, 1992, the district court granted their motion and dismissed the case for lack of subject matter jurisdiction. See Taber Partners I v. ___ __________________ Insurance Co. of North America, Inc., 798 F. Supp. 904, 912 _____________________________________ (D.P.R. 1992). In this appeal, Taber and Merit, adversaries below, mount a joint challenge to the district court's dismissal of their case. In so doing, they argue that, in light of the undisputed evidence that Lerfer's and Calumet's corporate activities occurred almost exclusively in New York, the district court's selection of Puerto Rico as the principal place of business of both corporations is clearly erroneous. Before addressing appellants' argument, we sketch the relevant facts. II. II. ___ FACTUAL BACKGROUND FACTUAL BACKGROUND __________________ In December 1986, Mr. F. Eugene Romano and Ms. Linda E. Romano, citizens of New York, incorporated Lerfer and Calumet in New York. At all relevant times,1 Eugene ____________________ 1. For purposes of diversity jurisdiction, citizenship is determined as of the date of the initiation of the lawsuit. See, e.g., Freeport-McMoRan, Inc. v. K N Energy, Inc., 111 S. ___ ____ ______________________ ________________ Ct. 858, 859 (1991); Media Duplication Servs., Ltd. v. HDG _______________________________ ___ Software, Inc., 928 F.2d 1228, 1236 (1st Cir. 1991). Thus, ______________ we recite relevant facts as they existed on February 15, 1991, the date Taber filed its complaint. -4- 4 Romano owned all the outstanding shares of Lerfer, and Linda Romano owned all the outstanding shares of Calumet. Linda Romano and Mrs. Jeanne Romano served as the officers of Lerfer, while Eugene Romano and Jeanne Romano served as the officers of Calumet. The same three individuals also served as the directors of both corporations. Lerfer and Calumet are "Subchapter S" corporations, a status entitling them to favorable tax treatment under both federal law, see generally 26 U.S.C. 1361 et seq., and ___ _________ __ ____ state law. See generally New York Tax Law 660(a) (McKinney ___ _________ 1987). See also Taber Partners I, 798 F. Supp. at 907-09 ___ ____ _________________ (explaining the legal and practical underpinnings of an "S Corporation"). The Certificates of Incorporation of both companies contain a broad declaration of corporate purpose "to engage in any lawful acts or activities for which corporations may be organized under the Business Corporation Law of the State of New York . . . ." The headquarters (and sole office) of both corporations is located at 501 Main Street, Utica, New York. All corporate books and records are maintained at the headquarters, and all accounting, auditing, and legal work is handled for both corporations in the state of New York by New York accountants and attorneys. Both corporations maintain their bank accounts in New York, and Lerfer also maintains a working capital account with an investment firm in New York. -5- 5 Each files federal income tax returns from New York and state income tax returns in New York. Neither files income tax returns in Puerto Rico. On December 29, 1986, shortly after their incorporation, Lerfer and Calumet entered into a partnership agreement ("the Agreement") that formed Taber. The Agreement lists New York, or "such other place or places as the [p]artners may determine[,]" as Taber's principal place of business.2 Under the Agreement, Lerfer obtained a 99% ownership interest in Taber, and Calumet obtained a 1% ownership interest. Lerfer and Calumet agreed to share in Taber's net profits and losses under a formula which mirrored their respective ownership interests. Article IV of the Agreement states: "The primary and specific purpose of [Taber] is to acquire, own, operate and manage [the Hotel in Puerto Rico]." Pursuant to section 7.01 of the Agreement, Lerfer and Calumet delegated the day- to-day management of Taber to Eugene Romano, as executive director, and Linda Romano, as assistant director. All responsibilities not enumerated in section 7.01 were delegated to the partnership generally. The Agreement ____________________ 2. While the Agreement was negotiated, drafted, and recorded in New York, it was "protocolized" in Puerto Rico for the purpose of recording the deed to the Hotel at the Registry of Property in San Juan. The protocol procedure was necessary to establish Taber's authority to own property under Puerto Rico law. See P.R. Laws Ann. tit. 31, 4313 (1991). ___ -6- 6 specifically granted Taber the authority, inter alia, to _____ ____ borrow money, enter into contracts, bring and defend legal actions, and "[d]o any and all other acts and things necessary or proper in furtherance of the [p]artnership business." Since their incorporation in 1986, Lerfer and Calumet have both described themselves on their federal and state tax returns as "holding compan[ies]." Eugene and Linda Romano testified in their depositions that each corporation's sole function is to hold or administer its respective interest in Taber. To this end, Lerfer and Calumet employ a "control-group" of twelve individuals to maintain their corporate records and financial accounts. All such maintenance occurs exclusively in New York. An example of the type of New York-centered activity in which Lerfer and Calumet engage is their management of loan transactions designed to secure their ownership interests in Taber. For instance, Eugene Romano has made substantial loans (totalling approximately $8,000,000) to Lerfer, which, in turn, reloaned these funds to Taber. Each of these loans consisted of funds that originated in New York and were evidenced by promissory notes prepared, executed, and delivered in New York. The record reveals that all policy decisions for Lerfer and Calumet are made in New York. For example, the decision to invest in Taber was made in New York. The -7- 7 election of corporate officers and the appointment of accountants occur at the annual Board of Directors meetings held in New York. Indeed, the record contains almost no evidence of corporate activity on the part of either Lerfer or Calumet taking place outside of New York.3 Despite these uncontroverted facts, the district court concluded that the principal place of business of both Lerfer and Calumet was Puerto Rico. In so doing, the court rejected appellants' characterization of Lerfer and Calumet as "passive" holding companies and found that their raison ______ d'etre included the operation of the Hotel: ______ Only a[n] unrealistically narrow view of the orientation of the corporations and their partnership could yield such a conclusion. The corporations were formed to act as owners of the [Hotel]. They devote almost all of their corporate activity to administer their assets in the partnership. They actively authorized the formation of Taber and the obtaining of a bond to assist in the financing of the projects. They have loaned substantial amounts of money to Taber. And the directors of the partnership, Mr. and Ms. Romano, are the directors of the corporations. Under these circumstances, the Court cannot accept the characterization of the corporations' interests in Taber as passive. The Court therefore considers of greater significance the location of the corporations' primary activity. This activity is the renovation and operation ____________________ 3. The record reveals that Lerfer's and Calumet's Boards of Directors held two "special meetings" in San Juan, Puerto Rico, in connection with the initial purchase and subsequent refinancing of the Hotel. -8- 8 of the [Hotel], which is located in Puerto Rico. Taber Partners I, 798 F. Supp. at 912. We do not concur in _________________ the district court's analysis. III. III. ____ DISCUSSION DISCUSSION __________ A district court's determination of citizenship for purposes of diversity jurisdiction is a mixed question of law and fact. As such, we will not set aside the district court's decision unless it is "clearly erroneous." Lundquist _________ v. Precision Valley Aviation, Inc., 946 F.2d 8, 11 (1st Cir. _______________________________ 1991); Media Duplication, 928 F.2d at 1237. In addition, we _________________ review the facts of this case mindful that the party invoking the jurisdiction of a federal court carries the burden of proving its existence. See, e.g., Lundquist, 946 F.2d at 10. ___ ____ _________ In this circuit, we utilize "three distinct, but not necessarily inconsistent tests" for determining a corporation's principal place of business: (1) the "nerve center" test, which searches for the location from which the corporation's activities are controlled and directed; (2) the "center of corporate activity" test, which searches for the location of the corporation's day-to-day management; and (3) the "locus of the operations of the corporation" test, which searches for the location of the corporation's actual -9- 9 physical operations. Topp v. CompAir Inc., 814 F.2d 830, 834 ____ ____________ (1st Cir. 1987). While we have not had occasion to apply these tests to a general partnership whose partners are corporations, we frequently have applied them to corporations involved in parent-subsidiary relationships. See, e.g., U.S.I. ___ ____ ______ Properties Corp. v. M.D. Constr. Co., Inc., 860 F.2d 1, 7 ________________ _______________________ (1st Cir. 1988), cert. denied, 490 U.S. 1065 (1989); _____ ______ Rodriguez v. SK & F Co., 833 F.2d 8, 9 (1st Cir. 1987); Topp, _________ __________ ____ 814 F.2d at 833-39; Lugo-Vina v. Pueblo Int'l, Inc., 574 F.2d _________ __________________ 41, 43-44 (1st Cir. 1978); de Walker v. Pueblo Int'l, Inc., _________ ___________________ 569 F.2d 1169, 1170-73 (1st Cir. 1978). In this context, we have repeatedly held that, where there is no evidence that the integrity of the corporate form has been violated, the separate corporate identities of a parent and subsidiary should be honored when determining either one's principal place of business. See U.S.I. Properties, 860 F.2d at 7 ___ _________________ (recognizing separate corporate identity of subsidiary despite evidence that subsidiary was wholly-owned by "grandparent" corporation, shared all its officers and directors with grandparent, was grossly undercapitalized, and did not prepare its own budget, construction requirements, or policies and procedures); Rodriguez, 833 F.2d at 9 _________ (recognizing separate corporate identity of subsidiary where evidence showed that it operated independently from its -10- 10 parent); Topp, 814 F.2d at 833 (recognizing separate ____ corporate identity of subsidiary holding company despite evidence that it could not act without the express permission of its parent, and that its sole function was to serve as financial conduit for parent); Lugo-Vina, 574 F.2d at 43 _________ (recognizing separate corporate identity of parent where evidence showed it operated independently of wholly-owned subsidiary); de Walker, 569 F.2d at 1173 (recognizing __________ separate corporate identity of parent despite evidence that parent consolidated its profits and losses with that of its wholly-owned subsidiary in presenting parent's financial reports to shareholders, that subsidiary was considered a "division" of parent, and that subsidiary accounted for 60% of parent's and subsidiary's combined operations). Accord ______ Danjaq, S.A. v. Pathe Communications Corp., 979 F.2d 772, _____________ ___________________________ 774-75 (9th Cir. 1992) (recognizing separate corporate identity of parent despite evidence that subsidiary "perform[ed] the lion's share" of the film production for the parent) (citing Lugo-Vina, 574 F.2d at 43-44); Pyramid _________ _______ Securities Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1120 _______________ ___________________ (D.C. Cir.) (recognizing separate corporate identity of parent despite evidence that parent was "alter-ego" of its subsidiary and was being sued for acts of its subsidiary) (citing U.S.I. Properties Corp., 860 F.2d at 7), cert. _________________________ _____ denied, 112 S. Ct. 85 (1991); Schwartz v. Electronic Data ______ ________ ________________ -11- 11 Sys., Inc., 913 F.2d 279, 283 (6th Cir. 1990) (recognizing __________ separate corporate identity of subsidiary where evidence showed "formal separation [was] maintained") (citing U.S.I. ______ Properties Corp., 860 F.2d at 7; Topp, 814 F.2d at 835). _________________ ____ Contra Freeman v. Northwest Acceptance Corp., 754 F.2d 553, ______ _______ __________________________ 557 (5th Cir. 1985) (imputing citizenship of a subsidiary to its parent and alleged "alter-ego") (citing Toms v. Country ____ _______ Quality Meats, Inc., 610 F.2d 313, 315-16 (5th Cir. 1980)); ___________________ Bonar, Inc. v. Schottland, 631 F. Supp. 990, 997-98 (E.D. Pa. ___________ __________ 1986) (imputing citizenship of parent to subsidiary where evidence showed that the business of both was "identical" and court determined that their formal separation was "merely a corporate fiction"). For instance, in Topp, we held that the district ____ court erred in applying the "nerve center" test in a manner which "ignore[d] the separate corporate identity of the corporation whose citizenship [was] being sought." Topp, 814 ____ F.2d at 835. In that case, the district court determined that the principal place of business of the subsidiary was England, the location of the parent. Id. at 832. The ___ subsidiary in Topp was a holding company with no ____ manufacturing, purchasing, or sales facilities. Id. at 834 ___ n.3. Its principal function was to act as a financial conduit for its parent, providing administrative and financial services to various other subsidiaries across the -12- 12 United States. Id. at 834. The district court found that, ___ although the subsidiary maintained an office and conducted its business activities in New Hampshire, it was controlled by the parent who made all of the major policy decisions, including the hiring and firing of the employees of the subsidiary. As a result, the district court reasoned that England was the subsidiary's "nerve center." Id. at 832. ___ We reversed the district court and held that it erroneously merged the activities of the subsidiary and the parent in determining the subsidiary's "nerve center." Id. ___ at 834. We made clear that, in determining a corporation's principal place of business, the activities of the company whose citizenship is at issue are those that are relevant. Id. Moreover, we held that as long as the corporate ___ formalities are preserved by the parent and subsidiary, they are entitled to recognition: [D]efendants presented uncontradicted evidence that [the subsidiary] maintained, in New Hampshire, its own general ledger, corporate minutes book and register of unissued stock, its own bank accounts, and its own executive offices. [The subsidiary] filed its own federal and state income and unemployment taxes, social security contributions and excise taxes. This evidence indicates that the separate corporate identity of [the subsidiary] is entitled to be recognized. Id. at 837. We therefore concluded that, while "the shots" ___ may have been called by the parent in England, the principal -13- 13 place of business of the subsidiary was New Hampshire, the "operational center of the corporation in question." Id. at ___ 835 n.4. Likewise, in de Walker, we held that a parent's __________ principal place of business was Puerto Rico, the situs of its ___ "day-to-day management and operations," rather than New York, the place where its wholly-owned subsidiary conducted business. de Walker, 569 F.2d at 1172. Despite compelling _________ evidence that the parent and subsidiary in de Walker were __________ closely intertwined, see id. at 1171, we were not persuaded ___ ___ to ignore their separate corporate identities. Id. at 1172. ___ The critical factual question in de Walker, as in __________ Topp, was not the degree of control the parent exercised over ____ the subsidiary, but whether the two businesses preserved their separate corporate identities. We reasoned that: While the documents . . . indicate that [the parent] was ultimately the sole beneficiary and director of [the subsidiary's] corporate activities, there is nothing in the record to undermine [the parent's] claim that the two corporations were separately incorporated, had separate boards of directors, kept separate accounting and tax records, and had separate facilities and operational personnel. And, leaving aside the activities of [the subsidiary in New York], there is next to nothing in the record to establish that [the parent], in its corporate capacity, __ ___ _________ ________ conducted any business outside Puerto Rico. -14- 14 de Walker, 569 F.2d at 1171 (emphasis supplied). We further __________ reasoned that the close interrelationship of the corporations was incidental to the parent's ownership of 100% of the subsidiary's stock and did "not justify ignoring the otherwise separate character of the two corporations."4 Id. ___ at 1173. Thus, pertinent circuit authority, particularly our opinions in Topp and de Walker, stand for the following two ____ _________ unremarkable propositions: (1) that in determining a corporation's principal place of business, a district court's inquiry must focus solely on the business activities of the ______ corporation whose principal place of business is at issue; and (2) that an exception to this general rule applies where there is evidence that the separate corporate identities of a parent and subsidiary have been ignored. We can discern no reason why these propositions should not apply with equal force where the entities at issue are corporate partners.5 ____________________ 4. An exception to this general rule exists in cases where there is evidence that the parent and subsidiary have violated the integrity of the corporate formalities which they selected. E.g., de Walker, 569 F.2d at 1173. ____ _________ 5. The appellees attempt to justify the district court's treatment of Taber, Lerfer, and Calumet as one entity for diversity purposes by relying almost exclusively upon New York partnership law, which they contend regards the partners and a partnership as a single entity. Whether or not appellees are correct in their characterization of New York partnership law, a proposition on which we express no opinion, such law is not controlling in light of federal law _______ which distinguishes between a partnership and its partners for purposes of diversity jurisdiction. See, e.g., Carden, ___ ____ ______ -15- 15 Here, the uncontroverted facts reveal that the sole corporate "activities" of Lerfer and Calumet consist of holding or administering their assets in Taber, and that all such administering occurs exclusively in New York. Moreover, there is no evidence that Lerfer and Calumet engage in the operation and/or management of the Hotel. Indeed, it is uncontroverted that Taber was expressly created by Lerfer and Calumet, as stated in the Agreement, "to acquire, own, operate and manage [the Hotel in Puerto Rico]." See also 798 ___ ____ F. Supp. at 905, 906 (characterizing as undisputed the fact that "Taber's business is the operation and management of the [Hotel]"). It is also apparent from the Agreement that Lerfer and Calumet delegated the day-to-day management of Taber to Taber's officers, Eugene and Linda Romano. Appellees have introduced no evidence to suggest that either Lerfer or Calumet ever usurped that role.6 ____________________ 494 U.S. at 195-96. We therefore find appellees' argument unpersuasive. 6. We are aware that the district court found that Lerfer's and Calumet's "primary activity . . . is the renovation and operation of the [Hotel], which is located in Puerto Rico." See Taber Partners I, 798 F. Supp. at 912. However, we have ___ ________________ not found any evidence to support such a finding. Indeed, the district court itself found that "[Lerfer and Calumet] devote almost all of their corporate activity to administer their assets in the partnership," id., activity which occurs ___ almost exclusively in New York. It further found that "Taber's business is the operation and management of the [Hotel]." Id. at 906. Given that the district court made no ___ attempt to reconcile these findings, we are not inclined to accord them any deference. -16- 16 In sum, the record reveals that Lerfer and Calumet serve as holding companies which manage their assets in Taber, a separate, and legally distinct, partnership entity, and that all their "activities" as holding companies occur exclusively in New York. We need go no further. Under either the "nerve center" test or the "center of corporate activity" test,7 the principal place of business of both Lerfer and Calumet is New York.8 Cf. Vareka Invs., N.V. v. ___ __________________ American Inv. Properties, Inc., 724 F.2d 907, 910 (11th Cir.) ______________________________ (holding that Ecuador corporation which served as "passive investment vehicle" for Florida real estate venture had principal place of business in Ecuador where it maintained its corporate books and records, made all corporate decisions, held all corporate meetings, hired its employees, and obtained loans for the initial purchase of the venture), cert. denied, 469 U.S. 826 (1984).9 Both Lerfer and Calumet _____ ______ ____________________ 7. Because Lerfer and Calumet have no physical operations (i.e., factories, warehouses, sales offices, etc.) the "locus ____ of the operations of the corporation" test would not be helpful. See Topp, 814 F.2d at 834 n.3 (rejecting utility of ___ ____ a "locus of physical operations of the corporation" test for a holding company). 8. Because we find that New York is the principal place of business of both Lerfer and Calumet under either the "nerve center" or "center of corporate activity" test, we need not determine which of the two tests is most appropriate under these facts. 9. In so holding, we are not unaware of a line of cases in which district courts, in determining the principal place of business of a holding company, have looked to the business of the entity whose assets are being held rather than to the -17- 17 ____________________ business of the holding company. See Bonar, 631 F. Supp. at ___ _____ 996 ("[the holding company] was created to hold and operate [parent's] interest in [Pennsylvania company], and it has no business other than this venture. Therefore, [the holding company's] principal place of business is clearly Pennsylvania, not the state in which its executive and administrative offices may be located . . . ."); Hanna Mining ____________ Co. v. Minnesota Power & Light Co., 573 F. Supp. 1395, 1400 ___ ____________________________ (D. Minn. 1983) ("[The holding company] was created to hold and operate [parent's] interest in [Minnesota venture], and it has no business other than this venture. Therefore, [the holding company's] principal place of business is clearly in Minnesota, not in the state in which its executive and administrative offices may be located . . . ."), aff'd, 739 _____ F.2d 1368 (8th Cir. 1984); Hereth v. Jones, 544 F. Supp. 111, ______ _____ 112 (E.D. Va. 1982) ("[The holding company's] sole raison ______ d'etre is to be the corporate general partner in [a] Virginia ______ nursing home venture. Thus[,] such activity as exists in Virginia is greater than the non-activity in any other [s]tate."). While we were unable to discern from the facts of Hanna _____ Mining exactly what level of activity took place in the state ______ where the holding company's offices were located, the facts of both Bonar and Hereth reveal that the holding companies at _____ ______ issue in each case performed no corporate activity of any __ kind in the states where their offices were located. Indeed, in Bonar, the evidence revealed that the "office" was merely _____ a mailing address, and that the company had no employees, executives, officers, or directors in the state where the "office" was located. Bonar, 631 F. Supp. at 994-95. As a _____ result, the court was persuaded to look to Minnesota, where the holding company's attorney resided and worked, where its officers and directors resided, and where the negotiations over the initial stock purchase occurred. Id. at 995. ___ Likewise, in Hereth, the court found that the holding company ______ had "absolutely no function or activity" in the state of incorporation, and had "no employees anywhere." Hereth, 544 ______ F. Supp. at 112. As a result, the court looked to the activities of the business venture that was owned by the partnership in which the holding company was a general partner. Id. ___ The instant case, however, presents an entirely different fact pattern. As detailed above, Lerfer and Calumet operate out of New York. They have an office, _______ employees, bank accounts, a working capital account, corporate books and records, and Board of Directors meetings in New York. The corporate officers and directors all reside in New York, and almost all of the corporations' decisions -18- 18 are therefore citizens of New York. And because a partnership is a citizen of those states in which its partners are citizens, see supra p. 3, it follows that Taber ___ _____ is also a citizen of New York, and that the district court's contrary determination was clearly erroneous. IV. CONCLUSION IV. CONCLUSION _______________ As Taber is a citizen of New York, the amount in controversy is ample, and none of the entities on the other side of the lawsuit shares Taber's citizenship, subject matter jurisdiction is present. We therefore reverse and remand the case for further proceedings consistent with this opinion. Reversed and remanded. ______________________ ____________________ are made in New York. As such, Lerfer and Calumet, unlike the holding companies at issue in Bonar and Hereth, are _____ ______ holding companies with corporate operations distinct from those of the company whose assets they hold. As a result, we find the reasoning in the above line of cases inapposite. -19- 19