Russell A. LUGO–VINA et al.,
Plaintiffs, Appellees,

v.

PUEBLO INTERNATIONAL, INC., et
al., Defendants, Appellants.

No. 77–1206.

United States Court of Appeals,
First Circuit.

April 27, 1978.

William L. Patton, Boston, Mass., with whom John M. Harrington, Jr., Ropes & Gray, David Rive Rivera; and Calderon, Rosa, Silva & Vargas, Hato Rey, P. R., were on brief, for defendants, appellants.

Ernesto Maldonado-Perez, San Juan, P. R., for plaintiffs, appellees.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, MOORE, Senior Circuit Judge.**

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiff-appellee, Russell Lugo-Vina, a resident of Puerto Rico, was injured in a fall on the premises of a supermarket in Puerto Rico operated by defendant Pueblo International, Inc. (Pueblo). In this appeal, Pueblo challenges the size of the jury award and also maintains that the district court erred in finding diversity of citizenship. Because we decide that there was no

** Of the Second Circuit, sitting by designation.

diversity jurisdiction, we do not reach the issue of damages.

Plaintiff filed suit in October 1974 in the District of Puerto Rico. A few months earlier the district court had consolidated five other actions against Pueblo, *sub nom. Agosto Alamo v. Pueblo International, Inc.,* for determination of the diversity jurisdiction question. In an opinion filed in June 1974, visiting Judge Dalton found that the *Agosto Alamo* plaintiffs had not established that Pueblo, a Delaware corporation, had its "principal place of business," *see* 28 U.S.C. § 1332(c), outside Puerto Rico. He therefore ordered the cases dismissed.

Relying on Judge Dalton's opinion, Chief Judge Toledo in March 1975 ordered plaintiff-Lugo-Vina's action dismissed. Shortly thereafter, Lugo-Vina moved to vacate the order of dismissal on grounds that visiting Judge Turk had agreed to reconsider Judge Dalton's order in *Agosto Alamo.* After Judge Turk vacated the *Agosto Alamo* dismissal, Judge Toledo vacated his dismissal in *Lugo-Vina.* A jury trial and this appeal followed.

■ The answers to interrogatories, affidavit, and deposition of Pueblo's Executive Vice President Vallecillo revealed that Pueblo in 1972,[1] directly operated 20 stores in Puerto Rico. Through wholly owned subsidiaries, Pueblo operated 8 other stores in Puerto Rico, ran a bread factory and operated several other stores and businesses in the Caribbean. Pueblo also owned all the stock in Hills Supermarkets, Inc., a New York corporation operating 71 supermarkets in the metropolitan New York area. The operation of the supermarkets and other businesses was conducted from three "responsibility centers." The Hills markets were run from a center on Long Island. The Caribbean area markets were run from Puerto Rico and the bread factory and other enterprises were also centrally directed from Puerto Rico. The heads of the "responsibility centers" had membership on the Pueblo Board of Directors and the Board's Executive Committee. Neither the Board nor the Executive Committee had a situs since meetings were regularly held in New York, Puerto Rico and elsewhere. However, three, perhaps four, members of the five-member Executive Committee worked regularly in Puerto Rico. The functions of the "responsibility centers," the Board of Directors and the Executive Committee were not described in great detail. Mr. Vallecillo deposed that the responsibility centers "report" to the Board of Directors. He also stated that the Board and Executive Committee "establish certain policies as to how business is to be conducted in general and . . . approve budgets, establish goals for the subsidiaries and/or divisions and/or responsibility centers and . . . also approve, at those levels, major capital requirements . . . ." Mr. Vallecillo also stated that the Executive Committee managed

> "the business and affairs of the corporation, in such manner as the Executive Committee shall deem for the best interests of the corporation in all such cases in which specific directions shall not have been given by the Board of Directors."

The record also reveals that the Chairman of the Board's office was in New York City where "he looks over the shoulder [of each responsibility center] to the extent that every division reports to the chairman of the board." Mr. Vallecillo also stated without elaboration that the responsibility centers report to the Board and Executive Committee through the Chairman. He stated that the Chairman had moved his office to New York because Hills had been newly acquired and its operations could be better scrutinized from New York.

---

1. Both Judges Dalton's and Turk's orders were based on the fruits of discovery conducted in 1972, although the *Lugo-Vina* complaint was not filed until October 1974. Jurisdiction is to be determined as of the time of the filing of the complaint. *See Smith v. Sperling,* 354 U.S. 91, 93 n.1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957), *quoting Mollan v. Torrance,* 9 Wheat. (22 U.S.) 537, 539, 6 L.Ed. 537 (1824). We assume from the willingness of counsel on both sides to rely on the discovery conducted in *Agosto Alamo* that the facts relative to Pueblo's locus remained substantially unchanged from 1972 through 1974.

Remaining evidence established that both the President and Executive Vice President of Pueblo had their offices in Puerto Rico. Mr. Vallecillo also deposed that the "principal offices" of the corporation were there and that Pueblo kept all of its books in Puerto Rico.

On this record, Judge Turk found that Pueblo's principal place of business was New York. He based his finding on two grounds. He disregarded the formal separation between Pueblo and its wholly owned subsidiary, Hills Supermarkets, Inc. Viewing them as a single entity, Judge Turk reasoned that since the majority of supermarkets was in New York, Pueblo had its base of operations in New York. He also found:

"that New York is the situs from which its activities are primarily controlled and directed. The executive offices are in New York as are the offices of the Chairman of the Board of Directors, and it is reasonable to conclude that the ultimate direction of the defendant's various business interests is established in New York."

■ With respect to the first basis for the district court's finding, it erred in ignoring the separate corporate identities of Hills and Pueblo. The evidence before the district court bearing on Hills' relationship to Pueblo differs in no material respect from that before the court in de Walker v. Pueblo International, Inc., 569 F.2d 1169 (1st Cir. 1978), where we held that it was error to look to the subsidiary's operations for purposes of determining where Pueblo's "principal place of business" was located. On the basis of Walker, therefore, we conclude that the district court erred insofar as its

finding of diversity was based on the location of the Hills operations.

We also think that the district court was clearly erroneous in finding that New York was "the situs from which [Pueblo's] activities are primarily controlled and directed." In Walker we were faced with the similar contention that Pueblo's "nerve center" was in New York. See Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862 (S.D.N.Y.1959); 1 J. Moore, Federal Practice ¶ 0.77[3] (1977 ed.). In Walker we rejected the applicability of the "nerve center" test on grounds that plaintiff's evidence did not show that anything resembling a nerve center was located outside Puerto Rico. Nothing more was shown than that one of two otherwise undescribed "executive offices" was in New York. In the present case, the evidence is slightly more informative, but it does not establish that anything which may be termed a "nerve center" is in New York.

■ The "nerve center" test was developed for application in cases involving "a 'large corporate enterprise with complex and farflung activities' where only the 'nerve center' can actually be termed the 'principal place of business.'" Walker, supra at 1172. Assuming without deciding that Pueblo is the type of corporation for which the "nerve center" test is appropriate,[2] we consider whether the corporation's activities in New York City were shown to constitute a "nerve center." Scot Typewriter Co., supra at 865, stated that the "nerve center" is the location from which the corporation's "officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective." The cases following Scot Typewriter Co. have found a "nerve center"

---

2. The "nerve center" test seems most appropriate in the case of a holding company. See, e. g., Textron Electronics, Inc. v. Upholtz-Dickie Corp., 193 F.Supp. 456, 459 (D.Conn.1961); 1 J. Moore, Federal Practice, ᚛ 0.77[3.–2], at 717.68 (1977 ed.). Pueblo, however, is both a holding company and an operating company. Even though the bulk of the overall entity's worth may be represented in the subsidiaries, it still seems more appropriate in a case such as this to emphasize Pueblo's role as an operating company. Plaintiff's accident occurred at a

store owned and operated directly by Pueblo through executive offices in Puerto Rico. Since the injury was attributable solely to alleged misfeasance at the operational level, all of which occurred in Puerto Rico, it would seem artificial at best to shift the focus to the alleged pinnacle of corporate control in New York for purposes of determining Pueblo's citizenship. We need not, however, face this question since plaintiff failed to establish that a New York pinnacle did in fact exist.

only in the locale where a substantial degree of direction of the enterprise, if not all important decision-making, occurs. *See* 1 J. Moore, *supra,* ¶ 0.77[3.–2] at 717.65–.66 & n.1 (collecting cases).

In the present case, plaintiff—who has the burden of proving diversity, *see Walker, supra* at n.4—has established only that the Chairman of the Board has his office in New York City. No information beyond generalities such as that the responsibility centers report to the Board and Executive Committee through him has been established with respect to the Chairman's duties. In contrast, the Board and Executive Committee were shown not to have a fixed situs, in New York or elsewhere, and Pueblo's books and a majority of its Executive Committee, including its President and Executive Vice President, were established to be in Puerto Rico. Furthermore, with respect to the operation of all supermarkets directly owned by Pueblo, as well as of subsidiaries other than Hills, the responsibility centers in Puerto Rico provide the management. There is no evidence, and it is not contended, that active managerial tasks on behalf of Pueblo itself, such as purchasing, occur in New York. On the basis of this evidence, the district court was clearly erroneous in finding that the Chairman of the Board's office was the "nerve center." *See Epstein v. Guilford Industries, Inc.,* 218 F.Supp. 286, 288–89 (S.D.N.Y. 1963). Given the diffusion of power among the "responsibility centers" and the lack of situs of Board of Directors and Executive Committee, no "nerve center" as described in the *Scot Typewriter Co.* line of cases—certainly none in New York—was established. Only Puerto Rico, the locus of Pueblo's regular operations, could therefore serve as its "principal place of business."

*Reversed and remanded with instructions to dismiss the complaint.*