**GULF CHEMICAL CORPORATION, Plaintiff,**

v.

**RAYTHEON–CATALYTIC, INC., Defendant.**

**Civil No. 96–1549(PG).**

United States District Court, D. Puerto Rico.

July 10, 1996.

Manuel Guzmán and Rosa María Cruz–Niemiec, San Juan, P.R., for Plaintiff.

Alberto Rodríguez Ramos and Eric Pérez, Hato Rey, P.R., for Defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Gulf originally brought this breach of contract suit in the Superior Court of Puerto Rico, Ponce Part. On May 6, 1996, the defendant, Raytheon–Catalytic ("Raytheon"), removed the action to this Court, basing jurisdiction on the diversity of state citizenship between it and Gulf. 28 U.S.C. § 1441 and §. 1332(a)(1). Before the Court is Gulf's motion to remand, alleging lack of diversity.

The law provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business...." 28 U.S.C. § 1332(c)(1). Gulf is incorporated in the British Virgin Islands and identifies Puerto Rico as its principal place of business. Raytheon is incorporated in Delaware. None of this is disputed. What is contested is Raytheon's principal place of business. Gulf asserts that, at the time of removal, Raytheon's principal operations, and therefore its citizenship for purposes of the diversity statute, were in Puerto Rico. Raytheon admits that for the year ending May 1, 1996, 75% of its revenues, and most of its projects and employees, were derived from or based in Puerto Rico. Nevertheless, citing the "nomadic" character of its contract-driven business, Raytheon points to its Philadelphia offices as its "principal place of business."

On June 13, 1996, the Court held a hearing to consider the arguments. For the reasons stated herein, the motion is DENIED. The Court has jurisdiction over this matter and the case will not be remanded.

### Legal Framework

The current version of § 1332(c), enacted in 1958, provides that a corporation may potentially be haled into two separate state court systems: (1) the state in which it is incorporated, and (2) the state which qualifies as the corporation's "principal place of business." (Prior to 1958, corporations were citizens only of the state of incorporation.) By extending the notion of corporate citizenship beyond the state of incorporation, § 1332(c) restricted the scope of diversity jurisdiction. The amendment was designed to ease the workload of the federal courts, as well as to remedy the perceived abuse whereby an essentially local corporation invoked diversity merely because it was incor-

porated in another state. Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 13B *Federal Practice and Procedure:* Jurisdiction 2d § 3624 at 607–08.

When considered in light of the historic policy rationale for diversity jurisdiction—to protect "foreign" litigants from potential local prejudice—the modern § 1332(c) makes sense. A corporation should not be permitted to claim fear of local prejudice in the community where the bulk of its operations are located, since such a corporation cannot reasonably claim to be "foreign." *Id.* § 3625 at 632.

Problems arise, however, in cases involving corporations with more complex structures. For example, a corporation might have operations in one or more states, its executive and administrative functions in another state, and be incorporated in yet a different state. Such structures pose analytical problems, given that, for purposes of section 1332(c), a corporation may have only one principal place of business.

The First Circuit embraces "three distinct, but not necessarily inconsistent tests for determining a corporation's principal place of business." *Taber Partners, I v. Merit Builders, Inc.,* 987 F.2d 57, 60 (1st Cir.1993) (citation omitted). To wit, (1) the "nerve center" test, which searches for the location from which the corporation's activities are controlled and directed; (2) the "center of corporate activity" test, which searches for the location of the corporation's day-to-day management; and (3) the "locus of the operations of the corporation" test, which searches for the location of the corporation's actual physical operations.[1] *Id.* at 61.

Commentators see essentially two distinct approaches embodied in these various tests. The first looks to the place of the corporation's major production or service activities, which generally equates with the location of

its major corporate assets. The second examines the location where corporate policy is made, focusing on the corporation's executive and administrative functions. Friedenthal, Kane & Miller, *Civil Procedure* § 2.6 at 35 (1985). *See also Ortiz Mercado v. Puerto Rico Marine Mngmnt.,* 736 F.Supp. 1207, 1211 n. 6 (D.P.R.1990).

Although the First Circuit has repeatedly emphasized that these tests "are not necessarily inconsistent," this palliative is clearly not true in the instant case. The parties agree that application of the nerve center test requires finding Raytheon a citizen of Pennsylvania. The locus of operations test, on the other hand, suggests that Raytheon is a Puerto Rico citizen. The question, then, is which test is appropriate in this case. The following discussion surveys the guidance the First Circuit has provided for making this decision.

■ *Of the five significant First Circuit cases that have addressed the principal place of business question over the past twenty years, four involved application of the nerve center test. The First Circuit has repeatedly observed that the test "was developed for application in cases involving a large corporate enterprise with complex and farflung activities where only the 'nerve center' can be termed the 'principal place of business.'"* de Walker v. Pueblo Int'l., Inc.,* 569 F.2d 1169, 1172 (1st Cir.1978). Because modern corporations may have operations in numerous states, the nerve center "is the location from which the corporation's officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective." *Lugo–Vina v. Pueblo Int'l., Inc.,* 574 F.2d 41, 43 n. 2 (1st Cir.1978).

■ The nerve center test is especially "appropriate in the case of a holding company."[2] *Id.* Because such firms lack "manu-

---

1. Other jurisdictions apply yet a fourth test: the "total activities test," which essentially combines the "nerve center" and "corporate activities" tests. *See, e.g., J.A. Olson v. City of Winona, Miss.,* 818 F.2d 401, 412 (5th Cir.1987); *Vareka Investments, N.V. v. American Investment Properties, Inc.,* 724 F.2d 907, 909–910 (11th Cir.1984).

2. Contrary to Gulf's assertions, however, the test is not *limited* to holding companies. In fact, in the very case that Gulf cites for this proposition, the Court applied the nerve center test to the operational components of a corporation which also happened to be a holding company, expressly disregarding the firm's subsidiary. *Lugo–Vina,* 574 F.2d at 43–44.

facturing, purchasing or sales facilities, ... tests which tend to focus upon the location of physical operations (i.e., factories, warehouses, sales offices) are not helpful." *Topp v. CompAir Inc.*, 814 F.2d 830, 834 n. 3 (1st Cir.1987). The point is that a company without tangible assets is, presumably, not bound by geographical limitations.

Furthermore, the operational locus of such a firm may shift over time as the firm follows its business. Thus, in *CompAir*, the Court found that CompAir was a holding company with four subsidiaries in five states, and that its "principal function" was to provide administrative and financial services to those operating subsidiaries. Accordingly, the Court held that CompAir's citizenship could not depend on the activities of any one subsidiary: "As the percentage of CompAir Inc.'s servicing activities devoted to a given subsidiary will vary from time to time, its own nerve center (the location from which CompAir Inc. controls and directs its servicing activities) is the most realistic indication of its principal place of business." *Id.*

Thus, Gulf is wrong when it argues that Raytheon's history is irrelevant. The blackletter rule that a corporation's principal place of business depends on the corporate structure as of the date of the complaint does not mean that the analysis must be done in a vacuum. To the extent the cases Gulf cites suggest to the contrary, they are either inapplicable in the First Circuit, or have been overruled. *See Timber Ridge Homeowners Assn. Inc. v. Allstate Dev. Corp.*, 472 F.Supp. 86, 87 (E.D.Wis.1979) (not controlling); *Sugar Corp. of P.R. v. Environeering, Inc.*, 520 F.Supp. 996, 999 (D.P.R.1981) (arguably overruled by *CompAir*).

On the other hand, the First Circuit has noted its disinclination to apply the nerve center test when doing so would lead to "artificial" results. Thus, in *Lugo–Vina*, a case involving an accident at a Pueblo supermarket in Puerto Rico, the Court "[a]ssum[ed] without deciding that Pueblo is the type of corporation for which the 'nerve center' test is appropriate...." *Lugo–Vina*, 574 F.2d at 43. In an accompanying footnote, however, the Court seemed to reject the test, noting that "[s]ince the injury was attributable solely to alleged misfeasance at the operational level, all of which occurred in Puerto Rico, it would seem artificial at best to shift the focus to the alleged pinnacle of corporate control in New York for purposes of determining Pueblo's citizenship." *Id.* at n. 2. This language should be viewed in light of the oft-quoted observation that the nerve center test "was developed for application in cases ... where only the 'nerve center' can be termed the 'principal place of business.' " Taken together, these quotations suggest that the "locus of operations" test is favored where there is, in fact, a location of operational predominance.

### Discussion

The above discussion demonstrates that the First Circuit has identified at least four factors the presence of which recommend application of the nerve center test, the general preference for an operations-based approach notwithstanding. The corporate litigant to whom the nerve center test should be applied (1) has diverse and far flung activities that (2) are controlled by a geographically separate headquarters; (3) has few tangible assets, such that (4) focusing on the locus of operational predominance could yield varying principal places of business over a relatively short period of time. As the following discussion demonstrates, all four factors are present in this case.

*1. Raytheon's activities are diverse and far flung.* Raytheon avers that in the year prior to this suit, 30% to 50% of its projects were outside Puerto Rico. This includes work in Mexico, Brazil, Holland and elsewhere in the United States. Although Gulf argues that Raytheon's projects are not sufficiently "far flung" to justify invocation of the

---

The issue that has apparently confused Gulf is the emphasis the First Circuit has placed on respecting a corporation's separate legal personality. The First Circuit has repeatedly held that this fundamental rule of corporate law applies with equal force to the principal-place-of-business determination. In fact, most of the First Circuit's recent principal place of business decisions—including *CompAir, infra., Lugo–Vina,* and *Taber Partners*—deal primarily with this corporate veil-piercing issue, and not with the choice-of-test issue currently before the Court.

nerve center test, the Court disagrees. The First Circuit has never stated to what extent business must be concentrated in one state to trigger application of the locus of operations test.[3] Furthermore, the approach taken here is in accord with the Court's decision in *Ortiz Mercado v. Puerto Rico Marine Mngmnt.*, 736 F.Supp. 1207, 1212 (D.P.R. 1990) (Laffitte, J.) (applying the nerve center test to a company whose activities were based predominantly in Puerto Rico, but whose headquarters were in New Jersey).

Second, Gulf argues that Raytheon is not sufficiently "diversified" because all its business is in construction contracting. This argument is based both on a constrained interpretation of the word "diverse," and on Gulf's contention that the nerve center test is applicable only to holding companies. The deficiencies of this latter argument were addressed in footnote two. As for the former, the Court simply notes that the term "diverse" can encompass servicing different clients on different projects in different locations. So construed, the term applies squarely to Raytheon.

*2. Raytheon's Philadelphia office is its "nerve center."* In *CompAir*, 814 F.2d at 837–38, the First Circuit offered the following expressly non-exhaustive checklist for determining a corporation's "nerve center:" (1) location of corporate headquarters; (2) location of directors' meetings; (3) location from where corporate income tax return is filed; (4) location of corporate records; (5) location of principal bank accounts; (6) location of corporate personnel who direct the daily operations of the corporation; (7) place where major policy decisions are made; (8) place which is designated in the charter or other corporate documents as the official headquarters of the company.

These factors all point to Philadelphia. Thus, Raytheon avers that all significant business, administrative and financial decisions are made in Philadelphia; a substantial majority of Raytheon's officers and directors have their offices in Philadelphia, with only one located in Puerto Rico; all of Raytheon's corporate records are maintained at Raytheon's Philadelphia headquarters; and Raytheon's tax and other governmental filings, with few exceptions, have consistently listed Philadelphia as the firm's principal place of business.

The only significant dispute is over the location of Raytheon's principal bank account. Raytheon employs three accounts. The only two with positive balances are located in Puerto Rico. The third, which consistently had zero balances at the end of the last several months, is located in Puerto Rico. Raytheon's explanation for this—that the Philadelphia account is for receivables, while the Puerto Rico account is for payables— supports viewing Raytheon as a large concern with far-flung operations, as well as highlights the analytical weakness of the "principal bank account" factor. Large corporations typically have several accounts.

Gulf's other arguments are similar in that they are double-edged swords. For example, Gulf asserts that Raytheon's information systems are not "based" in Philadelphia since, because the systems are computerized, they may be accessed in Puerto Rico. But nowadays this is true of all computerized systems, and only points to the growing obsolescence of conventional principal place of business analysis. In the information age, a corporation's principal place of business is often its nerve center, the temporary (or even permanent) concentration of its activities in one location or another notwithstanding.[4]

---

**3.** The original draft of the 1958 amendment to § 1332(c) proposed treating a corporation as a citizen of the state from which it derived more than half its gross income. *Federal Practice and Procedure* § 3624 at 605. This language was replaced, however, with the more flexible standard in place today. As far as the Court is aware, only one circuit has come close to adopting a quantitative approach. *See Industrial Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1094 (9th Cir.1990) (limiting application of the nerve center test to situations in which "no state contains a *substantial predominance* of the corporation's business activities") (emphasis added).

**4.** Perhaps recognizing this fact, the Seventh Circuit applies the "nerve center" test as the primary approach for determining a corporation's principal place of business. *Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1220, 1223 (7th Cir.1991).

Gulf also devotes substantial energy to arguing that Philadelphia is not the location where Raytheon "holds itself out to," and "has its most substantial contacts with," the public. For example, Gulf avers that Raytheon is not in the Philadelphia phone book, and that Raytheon's offices are hard to find in the office tower where they are located. True or not, these considerations are simply not relevant in a nerve center analysis. Nor are they sufficient to tip the balance in favor of applying a "locus of operations"—based approach.

*3. Raytheon has few tangible assets and focusing on location of operational predominance could yield different results over time.* Raytheon's December 31, 1995 balance sheet showed assets in excess of $32 million, but tangible assets of only $172,000—less than one-half of one percent of all of Raytheon's assets. Given this ratio, the fact that most of these tangible assets were located in Puerto Rico (approximately $150,000) is irrelevant.

Moreover, substantial evidence supports Raytheon's contention that its Puerto Rico presence has and will vary significantly over time. Raytheon's representatives averred to the following: Raytheon's Puerto Rico office was not opened until 1991. The company's operations in Puerto Rico did not become "substantial" until 1993. From 1993 until 1995, Raytheon's Puerto Rico business accounted for as much as 75% of all revenues, and from 50–70% of all projects world-wide. In January 1996, Raytheon had 1200 employees under contract in Puerto Rico. However, this figure had declined to 700 by March, and was approximately 250 at the end of April 1996, the time this suit was filed in the Commonwealth court. These facts suggest a business subject to considerable variability.

Gulf argues that Raytheon has not sufficiently documented the extent of its non-Puerto Rico based business. As support, Gulf proffers a Raytheon brochure which portrays quite a different picture of Raytheon's Puerto Rico presence. The brochure was prepared by Raytheon in 1993 for a sales pitch to a different petro-chemical company.

While the document is certainly intriguing, standing alone it is of questionable evidentiary value. Furthermore, to the extent that

Gulf finds Raytheon's factual proffers insufficient, it is curious that Gulf's own presentation of Raytheon's history has not elucidated the critical facts. It is noteworthy that Gulf *does not* assert that Raytheon has failed to comply with its discovery obligations. Gulf simply argues that Raytheon has not carried its burden of establishing diversity. The Court disagrees. Although Raytheon's evidence is admittedly short on specific dates, locations and amounts, the Court finds it sufficient at this time.

The above considerations support Raytheon's contention that its principal place of business is Pennsylvania. Therefore, Gulf's motion to remand (Dkt. #9) is **DENIED.**

**IT IS SO ORDERED.**