CARIBBEAN MUSHROOM
CO., INC., Plaintiff,

v.

GOVERNMENT DEVELOPMENT
BANK, et al., Defendant.

Civil No. 93–1015(JP).

United States District Court,
D.Puerto Rico.

Nov. 13, 1997.

Francisco De Jesús Schuck, Goldman, Antonetti & Córdova, San Juan, PR, for Plaintiff.

María de los Angeles Trigo Castillo, San Juan, PR, for Defendant Government Development Bank.

Luis Enrique Rodríguez Rivera, Cond. Patio Espanol, Old San Juan, PR, for Defendant PR Development Fund.

### OPINION AND ORDER

PIERAS, District Judge.

## I. INTRODUCTION

The Court has before it, for a second time, Defendants'[1] Motion for Summary Judgment (**Docket No. 22**) along with its attendant litany of responses and replies. This action stems from a commitment letter sent on November 4, 1977 by the Puerto Rico Development Fund ("GDF") to the Plaintiff, Caribbean Mushroom Co., Inc. ("Caribbean"), through which GDF agreed to extend a loan of $100,000.00 to Caribbean, subject to specific terms and conditions. On January 10, 1978, GDF informed Caribbean that the specific terms and conditions had not been met and that GDF would therefore not loan Car-

ibbean the $100,000.00. Plaintiff initiated this diversity action on January 7, 1993, alleging that GDF's refusal to loan Caribbean the funds in 1978 constituted a breach of contract and seeking damages in the amount of $4,500,000.00.

The Court previously granted codefendant GDF's Motion for Summary Judgment on one of two proposed grounds—that the three year statute of limitations of Article 946 of Puerto Rico's Commerce Code applied to bar this action—leaving one argument for judgment pending. The United States Court of Appeals for the First Circuit, reversed the Court's decision, finding that the generally applicable fifteen year statute of limitations of Article 1864 of the Civil Code applied, and remanded the case, The Court now returns to address the remaining argument in the Defendants' original Motion for Summary Judgement. Although styled as a motion for summary judgment, the remaining argument really amounts to a motion to dismiss for lack of subject matter jurisdiction, and that is how the Court will treat it. The Defendants argue that the Plaintiff, like the Defendants, was a citizen of Puerto Rico at the time it filed the complaint in this case. If the Defendants are correct, diversity is lacking and the Court has no power to hear this case. 28 U.S.C. § 1332.

## II. ANALYSIS

Federal courts are courts of limited jurisdiction. U.S. Const. art. III § 2. Congress has provided federal district courts with original jurisdiction over "all civil actions where the matter in controversy exceeds the sum of $50,000[2], exclusive of interest and costs, and is between citizens of different States." 28 U.S.C. § 1332 (amended by Pub.L. 104–317, Title II, § 205(a), 110 Stat 3850 (October 19, 1996)). The issue of subject matter jurisdiction may be raised at any time during a proceeding, either by the parties or by the Court, *sua sponte*, and at

---

1. The Motion was originally filed by codefendant Puerto Rico Development Fund but then joined by codefendant Government Development Bank. *See* docket No. 25. Therefore, the Court considers the motion to have been made by both Defendants.

2. After the plaintiff filed this case, Congress amended the amount in controversy requirement for diversity jurisdiction. As of the 90th day after October 19, 1996, for diversity jurisdiction to adhere to a controversy, over $75,000 must be at stake. 28 U.S.C. § 1332.

any point it becomes clear that the court, lacks subject matter jurisdiction, the court must dismiss the action. *See McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 184, 56 S.Ct. 780, 782, 80 L.Ed. 1135 (1935); *Capron v. Van Noorden,* 2 Cranch (6 U.S.) 126, 127, 2 L.Ed. 229 (1804); *Chaparro–Febus v. International Longshoremen Ass'n, Local 1575,* 983 F.2d 325, 329 n. 4 (1992). In considering whether the Court has jurisdiction over the subject matter of an action, the Court may consider extra-pleading material, such as affidavits and testimony. *Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *see, e.g., Media Duplication Services, Ltd. v. HDG Software, Inc.,* 928 F.2d 1228, 1236 (1st Cir.1991); *Rodriguez v. S K & F Co.,* 833 F.2d 8, 9 (1st Cir.1987).

■■■ In the case at bar, the Plaintiff alleges diversity of citizenship to invoke this Court's jurisdiction. The case involves a single corporate plaintiff and two public corporate defendants. For the purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). A corporation can have but a single principal place of business for the purposes of diversity jurisdiction. *Id.* (a corporation is a citizen of the State where it has its principal place of business); *Gafford v. General Elec. Co.,* 997 F.2d 150, 151 (6th Cir.1993); *Gulf Chemical Corp. v. Raytheon–Catalytic, Inc.,* 931 F. Supp. 955, 957 (D. Puerto Rico 1996). The party invoking federal jurisdiction bears the burden of proving that jurisdiction exists. *Taber Partners, I v. Merit Builders, Inc.,* 987 F.2d at 57, 60 (1st Cir.1993). Of course, where that jurisdiction rests on the diversity of the parties'

citizenships, the party invoking jurisdiction will be put to the task of proving that the parties' citizenships are indeed diverse. *Media Duplication Services,* 928 F.2d at 1236 ("Where the matter is contested the burden of proving a corporation's principal place of business based on the location of corporate activities at the time suit is instituted rests upon the party asserting the existence of diversity jurisdiction"); *de Walker v. Pueblo Int'l. Inc.,* 569 F.2d at 1169, 1173 (1st Cir. 1978); 13B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper *Federal Practice and Procedure,* § 3625, at 640 (1984).

It is undisputed that the Defendants in this action are citizens of only Puerto Rico for the purpose of diversity jurisdiction. Moreover, there is no question that Caribbean is a Delaware corporation, so the problem of diversity will be determined by the location of Caribbean's principal place of business, if any. The determination of Caribbean's citizenship is complicated in this case by the fact that it no longer housed an active enterprise when it filed the complaint in this suit. The issue of defunct[3] corporations' citizenship has seldom been addressed, and the courts that have come across the issue have approached it differently. Analytically, the issue is comprised of two sub-questions—can or must a defunct corporation have a principal place of business and if so, how is that place determined. The First Circuit has not yet had the issue before it, so the Court looks to jurisprudence from other jurisdictions for guidance.

The Second Circuit has held that "both the state of incorporation and the principal place of business should be considered" in evaluating the citizenship of a defunct corporation. *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 141

---

**3.** In this opinion, when the Court speaks of a defunct or inactive corporation, the Court means a corporation that at one time Engaged in an active enterprise, but no longer does. In *China Basin Properties, Ltd. v. Allendale Mutual Ins. Co.,* 818 F.Supp. 1301 (N.D.Cal.1992), the court made a helpful distinction between defunct and inactive corporations for the purposes of diversity analysis, a defunct corporation being one that "at one time, conducted business," and an inactive corporation, by inference, being one that never conducted any business. The other courts

that have addressed the issue have made no such distinction; in fact, in the other cases cited herein, the courts describe corporations as inactive that under *Allendale's* definition would be described as defunct. *E.g., Midlantic Nat'l Bank,* 48 F.3d at 697 n. 6 (discussing length of inactivity of an inactive corporation); *Harris,* 961 F.2d at 549 (corporation that has not been active for five years is inactive, not defunct). The Court's holding herein is limited to so-called "defunct" corporations—corporation's that have at some time been engaged in an active enterprise.

(2nd Cir.1991) The panel held that failing to consider the corporation's last principal place of business would provide a corporation with an uncalled for windfall that Congress never intended, because the inactive corporation, "no matter how local in character, could remove a case to federal court based on its state of incorporation." *Id.* On this reasoning, the *Passalacqua Builders* court upheld Judge Edelstein's determination that a defunct corporation is a citizen of "the place it last transacted business." *Id.* In affirming the lower court's ruling, the Second Circuit did not elaborate on the method for determining the location of a defunct corporation's principal place of business. Instead, the panel relied, without analysis, on an earlier opinion from a bankruptcy appeal, in which the court had relied on the last transactions made by the corporation for determining its citizenship.

The district courts that have addressed the issue have generally come to the same conclusion as the Second Circuit. *E.g., China Basin Properties, Ltd. v. One Pass, Inc.,* 812 F.Supp. 1038, 1040 (N.D.Cal.1993); *China Basin Properties, Ltd. v. Allendale Mut. Ins. Co.,* 818 F.Supp. 1301, 1305 (N.D.Cal.1992); *Comtec, Inc. v. National Technical Schools,* 711 F.Supp. 522, 525 (D.Ariz.1989); *but see Gavin v. Read Corp.,* 356 F.Supp. 483, 486 (E.D.Pa.1973). These decisions have universally rested, at least in part, on the goal of furthering Congress' intent in enacting 28 U.S.C. § 1332(c). The Court in *Comtec* elaborated:

> In the 1950's, Congress became concerned with the ease with which corporations removed cases to federal court based solely on their place of incorporation. *See* Jurisdiction of Federal Courts Concerning Diversity of Citizenship: Hearings on H.R. 2516 and H.R. 4497 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 85th Cong., 1st Sess. 8 (1957) (statement of Rep. Ashley); 104 Cong. Rec. 12683–85 (1958). Congress acknowledged the fact that the state of incorporation is often chosen for tax purposes. *See* S.Rep. No. 1830, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Ad. News 3099, 3102. The debate on the floor of the house, the discussions in congressional

committees, and the statements made to the Judicial Conference of the United States, all centered around the perceived evil of allowing an essentially local corporation to remove a case to federal court simply because the corporate charter was obtained in another state. *See* S.Rep. No. 1830, reprinted in 1958 U.S.Code Cong. & Ad. News, at 3101–02; 104 Cong. Rec. 12683, 12685 (1958) (statement of Rep. Celler); Hearings on H.r. 2515 and 4497, at 8 (statement of Rep. Ashley); Report of Committee on Jurisdiction and Venue, reprinted in 1958 U.S.Code Cong. & Ad. News 3114, 3120. To remedy this problem, Congress amended 28 U.S.C. § 1332(c) in 1958 ... the [amended] statute contains the implicit assumption that all corporations have a principal place of business.

711 F.Supp. at 523–24. The *Comtec* court then analyzed the argument that a defunct corporation could have no principal place of business in light of its determination of Congress' intent:

> The conclusion that a defunct corporation has no principal place of business also conflicts with the intent of Congress. Under such a rule, a defunct corporation, no matter how local in character, could remove a case to federal court based on its state of incorporation. [citations omitted]. The clear intent of Congress was to prohibit such maneuvers. [citations omitted].

711 F.Supp. at 525. The district courts have also placed reliance on their interpretation of the diversity statute:

> Section 1332(c) states that corporate diversity is based on both the place of incorporation and principal place of business. By using the conjunction "and," Congress intended for all of the requirements of the statute to be fulfilled. [citations omitted]. The conclusion that a defunct corporation has no principal place of business disregards one element that is a prerequisite to diversity jurisdiction.

711 F.Supp. at 524; *see also One Pass,* 812 F.Supp. at 1040 ("the use of the conjunction 'and' implies that Congress intended all elements to be met before diversity jurisdiction

will attach"); and *Allendale*, 818 F.Supp. at 1304–05.

The Fifth Circuit adopted a more flexible approach to the issue. In *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992), the court prescribed the same "total activity" test for inactive/defunct corporations that it prescribes for determining the principal place of business of active corporations. *Id.* at 551. The .Court then determined that a corporation could not, as a matter of law, have its principal place of business in a jurisdiction where it had been inactive "for a substantial period of time, in this case five years." *Id.* Because it reached that conclusion, the *Harris* court failed to elaborate on the application of the "total activities" test to defunct corporations. For example, the court did not state which point in time during the corporation's existence a court should consider in applying the test. Indeed, the Court explicitly held that limiting consideration to the corporation's last activities alone like the *Passalacqua Builders* court would be inappropriate under the "total activities" test, because it could lead to a finding of citizenship "in a jurisdiction in which it would never have been held to have its principal place of business while it was active." *Id.* Under the "total activities" test, the final activities of the corporation should be considered, but not dispositive. *Id.* The *Harris* court never explicitly reached the question of whether a defunct corporation necessarily has a principal place of business, but it's final decision certainly implies that a court may determine that an inactive/defunct corporation has no principal place of business and is only a citizen of its state of incorporation. *Id.* at 551 n. 12.

The Third Circuit recently addressed the issue and held that under the "corporate activities" test, which it has prescribed for determining the principal place of business of active corporations, an inactive/defunct corporation, because it has no corporate activities by definition, has no principal place of business. *Midlantic Nat'l Bank v. E.F. Hansen, Jr.*, 48 F.3d 693, 696 (3d. Cir.1995). Under this rule, an inactive/defunct corporation is a citizen only of its state of incorporation. In drawing this "bright line," the Third Circuit felt that the benefits of certain-ty and clarity outweighed the potential for harm identified by the Second Circuit. *Id.* at 698. Although acknowledging the line of contra jurisprudence, the court did "not find persuasive the argument that Congress' use in section 1332(c) of the conjunction 'and' signifies that Congress intended that the Courts strain to locate a principal place of business when no such place really exists." *Id.* The *Midlantic* panel then did its own brand of statutory construction, focusing on the tense of the verb "to have," to demonstrate Congress' lack of intent that defunct corporations necessarily have a principal place of business. *Id.* The court then proceeded to balance the advantage of clarity, which it considered its bright line rule to possess, against the concern for breaching Congress' intent, which it considered to be a possible result of its rule. In the panel's opinion, the clarity of its rule outweighed any likelihood of results contrary to Congress' intent.

■ Having briefly analyzed the conclusions reached and the reasoning used by the other courts that have addressed the issue, the Court must now determine whether a defunct corporation can or must have a principal place of business, and if so, how that place is determined. The Court believes that in choosing a rule, whether it be the "place of last activities test" of the Second Circuit, the bright-line "state of incorporation" rule of the Third Circuit, the amorphous "total activities" test of the Fifth Circuit, or some amalgam thereof, the principal concern is to further the goals of Article III's grant of diversity jurisdiction, *Allendale*, 818 F.Supp. at 1304 ("diversity jurisdiction serves to avoid the local prejudice of state courts by providing a neutral forum for citizens from another state or country") (citing *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 111, 65 S.Ct. 1464, 1471, 89 L.Ed. 2079 (1945)) and the intent of Congress in enacting the 28 U.S.C. § 1333(c)(1)—the statute establishing the limits of diversity jurisdiction, *Midlantic Nat'l Bank*, 48 F.3d at 698.

The Court believes that the bright line rule set forth by *Midlantic Nat'l Bank* goes against Congress' intent in enacting 28

U.S.C. § 1332(c)(1). In adding the "principal place of business" clause, Congress "purported to preclude what was in fact a local entity from suing (or being sued by) a local citizen in federal court simply because it was chartered in another state." Moore's Federal Practice ¶ 0.77[3.–4]. The Third Circuit asserts that its bright line rule "most closely comports with the plain meaning [and thus congressional intent] of section 1332(c)," but a simple hypothetical demonstrates the fallacy of that statement. Strict adherence to the Third Circuit's tense-driven, bright line rule that defunct corporations are citizens only where incorporated would seem to require that a corporation that has carried on all of its business in State X for fifty years but ceases to do business on a Tuesday would lose its State X citizenship on Wednesday. This Court does not believe that such a rule comports either with the goal of Congress in enacting section 1332(c) or with the Constitutional grant of judicial authority over diversity cases. Instead, the Court agrees with *Passalacqua Builders* assertion that limiting the citizenship of a defunct corporation to its state of incorporation flies in the face of Congress' intent. The Court also disagrees with the Third Circuit's opinion that the need for clarity justifies a result that may dishonor Congress' intent. The Court's reasoning is not based on formalistic statutory construction scrutinizing the placement of the conjunction "and" or the tense of the verb "to have." The Court believes that Congress' amendment to section 1332(c) responds to the realization that, with respect to local bias, a corporation is as much (if not more) of a local in the place where it conducts or conducted its activities than in the jurisdiction where it files papers. The Court does not believe that a defunct corporation suddenly and automatically becomes more closely associated with its state of incorporation and/or less closely associated with the place it conducted its business. As Judge Armstrong stated in *Allendale:*

> Unlike an inactive corporation, a defunct corporation had, at one time, been conducting business. As a result, the defunct corporation has established some connection with the state where it conducted its business. This distinction is significant because diversity jurisdiction serves to avoid the local prejudice of state courts by providing a "neutral" forum for citizens from another state or country. [citations omitted]. Thus, a defunct corporation, by virtue of having engaged in its business operations, is not at risk of being an alien in state court.

*Allendale,* 818 F.Supp. at 1304. Because the Court believes that a defunct corporation is still as closely associated, for the purpose of local bias, with the jurisdiction where it has or had its principal place of business as with its state of incorporation, and because the Court believes that Congress' intent in including the "principal place of business clause" in the diversity statute was to give effect to that reality, the Court holds that a defunct corporation's principal place of business as well as its state of incorporation must be considered for citizenship purposes. The Court must now determine the appropriate manner for determining a defunct corporation's principal place of business.

■ The Court agrees with the *Harris* court that the Second Circuit's rigid place of last corporate activity test might lead to incongruous results that belie the true character of a corporation. 961 F.2d at 551. The Court hesitates to adopt *Harris'* "total activity" test, however. The Fifth Circuit's decision to assign that test for inactive/defunct corporations was based on its prior decision to prescribe it for determining the principal place of business of active corporations. *Harris,* 961 F.2d at 551. Although this Court has voiced its approval of the progressive "total activity" test as opposed to the somewhat artificial multi-test approach still endorsed by the First Circuit, *see Savis, Inc. v. Warner Lambert, Inc.,* 967 F.Supp. 632, 641 n. 11 (D.Puerto Rico 1997) (J. Pieras), the Court will adopt the jurisprudence prescribed by the First Circuit with respect to active corporations for application to defunct corporations. *See Midlantic,* 48 F.3d at 696; *Harris,* 961 F.2d at 551.

In applying any test, however, special consideration must be given to the nature of a defunct corporation. A defunct corporation has generally transformed, over, some period of time, from one engaged in active enter-

prise to a lifeless shell. As was the case with Caribbean, when a corporation hits hard financial times, it may cease its principal operations and engage in the more administrative task of attempting to salvage the business or appease creditors. It may dwindle over a span of years or be destroyed by a single sudden incident. The determination of a defunct corporation's principal place of business will in many instances depend on the "slice" of corporate activity analyzed—so do we consider the activity the corporation was engaged in on the day it ceased activity? The week before? The year before? Realistically, these points in time often cannot be pinpointed, and more importantly, they may not have much relevance to the question presented. The Court believes that the determination of the point in time best suited for applying the multi-test regime endorsed by the First Circuit must be executed on a case-by-case basis. In making that determination, the Court will be mindful of the goal of the test, which is to determine the jurisdiction with which the corporation is most closely associated— i.e., where the corporation would be least prejudiced by bias against, non-locals.

The Court has recently had an opportunity to canvass the First Circuit's approach(es) to determining a corporation's principal place of business:

> The First Circuit has adopted three tests for determining the principal place in which a corporation does business for the purpose of diversity jurisdiction—"(1) the 'nerve center' test, which searches for the Location from which the corporation's activities are controlled and directed; (2) the 'center of corporate activity' test, which searches for the location of the corporation's day-to-day management; and (3) the locus of the operations' test, which searches for the location of the corporation's actual physical operations." *Taber*

Partners, 987 F.2d at 61; *de Walker*, 569 F.2d at 1170–73.

Despite having endorsed three distinct tests, the First Circuit has described the application of these tests as "not necessarily inconsistent." *Topp v. CompAir, Inc.*, 814 F.2d 830, 834 (1st Cir.1987). The application of the tests must be consistent because each corporation can have only one principal place of business. In order to obtain consistent results, a court should only apply one of the tests to any given corporation, because the foci of the various tests differ and could lead to disparate results.[4] Despite setting up a variety of distinct tests, however, the jurisprudence from this circuit provides little guidance as to when each test should apply, leading many courts facing the issue to apply each and every available test in order to avoid having to choose which test to apply. *See, e.g., Taber Partners*, 987 F.2d at 63 (applying all three tests); *de Walker*, 569 F.2d at 1172 (same); *Rivera v. Pepsico Puerto Rico, Inc.*, 936 F.Supp. 45, 47–48 (D.Puerto Rico 1996) (same); *but see Gulf Chemical Corp. v. Raytheon–Catalytic, Inc.*, 931 F.Supp. 955, 957 (D.Puerto Rico). That is particularly true with respect to the "locus of operations" and the "center of corporate activities" tests. We have found no precedent to explain when one of these and not the other should be applied. Indeed, the First Circuit appears to be the only circuit to apply distinct "center of corporate activities" and "locus of operations" tests. *See* Wright, *supra*, § 3625 (1997 Supp.). Therefore, the Court will simply determine whether application of the "nerve center" test is appropriate, and if not, the Court will apply the other two tests in tandem.

The general rule is that, "where a corporation is engaged in only one business activity, substantially all of whose opera-

---

**4.** This situation has lead several courts to adopt a unitary "total activities" test. *See Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 915 (10th Cir.1993) (recognizing that the "nerve center" and "corporate activity" tests are but "two sides of the same coin" and therefore adopting a "total activities" test incorporating elements of both); *Harris v. Black Clawson Co.*, 961 F.2d 547, 549–550 (5th Cir.1992); *Vareka Investments, N.V. v. Am. Inv. Prop. Inc.*, 724 F.2d 907, 910 (11th Cir.1984). The "total activities" test "incorporates both the place of activities test and the nerve center test," *Vareka*, 724 F.2d at 910, and, instead of focusing on either management or operations, determines the principal place of business of every corporation based on a single test considering "all the circumstances surrounding a corporation's business." *White v. Halstead Indus., Inc.*, 750 F.Supp. 395, 397 (E.D.Ark. 1990).

tions occur in one state, even though policy and administrative decisions are made elsewhere, the state of operations is the corporation's principal place of business." *Santana Salgado v. DuPont Pharmaceutical, Inc.*, 664 F.Supp. 644, 645 (D.Puerto Rico 1987); *Bender v. Hilton Riviera Corp.*, 367 F.Supp. 380, 383–384 (D.Puerto Rico 1973). In other words, "the bulk of corporate activity, as evidenced by the location of daily operating and management activities, governs the choice of a principal place of business." 13B Wright, *supra* § 3625, at 625. "Consequently, when a corporation is engaged in a single line of business with its operating functions located in one state and executive and administrative offices in another state, its principal place of business for diversity purposes is the former state." *Id.; accord Hilton Riviera Corp.*, 367 F.Supp. at 383. As the corporation's operations become more "far flung" and operations are carried out in multiple jurisdictions, however, the locus of operations becomes more difficult to determine and consideration of the corporation's locus of control, or "nerve center", becomes more important. *Topp*, 814 F.2d at 834, 13B Wright, *supra*, § 3625 at 630–632. This leads to the conclusion "that the nerve center test should be restricted to instances in which the place of operations logically cannot be used to determine a corporation's principal place of business." Wright, *supra* § 3625 at 635; *accord Topp*, 814 F.2d at 834 (application of "nerve center" test limited to "corporations with complex and far flung activities where only the nerve center can truly be termed the principal place of business").

*Savis, Inc. v. Warner Lambert, Inc.*, 967 F.Supp. 632, 637–638 (D.Puerto Rico 1997) (J. Pieras).

 Caribbean was incorporated in Delaware in 1975 by John Dougherty, a New York resident, for the purpose of operating a mushroom farm in Puerto Rico. It was wholly-owned by Dougherty. By April 1977, at the very latest, Caribbean's principal place of business was in Puerto Rico, where it had leased and modified real estate in Vega Baja, installed production equipment, and was ready to begin commercial mushroom farm-

ing. Dougherty Affidavit ("Aff.") at ¶ 2–3. Production began in April 1977 and sales commenced several weeks later. Aff. at ¶ 2–3. In December 1977, the farm experienced technical problems and mushrooms could no longer be produced. Aff at ¶ 4. The company let its last employee go at the end of March 1978 and paid guards (presumably to protect the land and equipment in Vega Baja) until August 1978. Aff. at ¶ 4. Dougherty administered the company from an office in his apartment in San Juan from 1975 or 1976 until early 1978, when he moved his operations to a desk in a canning company's offices in San Juan Aff. at ¶ 8.

Dougherty had begun efforts to reorganize and refinance Caribbean in July 1977 and continued such efforts, initially only in Puerto Rico but eventually outside of the island, through February 1980. Aff. at ¶ 5. In addition to attempting to refinance and reorganize, Dougherty directed efforts on behalf of Caribbean toward keeping Caribbean's creditors "at bay." He made trips to New York for such purposes in the summer and fall of 1978. Aff. at ¶ 5. In November 1978, Dougherty returned to live his home in New York, taking Caribbean's records and files. Aff. at ¶ 9. From that time until February 1980, when he learned that Caribbean's equipment in Vega Baja had been destroyed by vandals, Dougherty directed Caribbean's two pronged efforts to obtain capital and to keep creditors at bay from his home in New York. Aff. ¶ 20. At the time of the filing of this suit, January 7, 1993, Caribbean was defunct and non-operational and apparently had been so for about 13 years; it has not been dissolved. Pl.'s Answer to Defs.' Interrog. # 20.

The Court holds that Caribbean's principal place of business for the purpose of diversity jurisdiction is Puerto Rico. In reaching that conclusion, the Court first determines that the "nerve center" test is clearly not appropriate for Caribbean, whose operations were carried out in no more than two locations. The Court therefore analyzes Caribbean's principal place of business considering its locus of operations and/or its center of corporate activities. In doing so, we look at Caribbean's operations, not at a single point in time, but over the course of its short exis-

tence, with the goal of determining the character of Caribbean's citizenship when it filed this action.

Where a corporation is engaged in a single enterprise, substantially all of whose operations occur in one state, even though policy and administrative decisions are made elsewhere, the state of operations is the corporation's principal place of business. *Savis*, 967 F.Supp. at 638 (citations and internal quotations omitted). Indeed, the Plaintiff fully admits that Caribbean's principal place of business was Puerto Rico up until the time Dougherty moved back to New York. The Plaintiff contends that when Dougherty moved, however, because no activity was going on in Puerto Rico and because Dougherty was directing Caribbean's efforts to restart its operations from New York, New York became Caribbean's principal place of business. The Court disagrees. Taking into account the nature of a defunct enterprise; Mr. Dougherty's clear goal of restarting Caribbean's activities in Puerto Rico; the fact that Caribbean's land and property—apparently its only real assets—were located in Puerto Rico; and the nature of the conduct carried out on Caribbean's behalf from New York; the Court finds that Dougherty's move to New York with the corporate files and records did not alter Caribbean's principal place of business.

A corporate business that goes sour generally does so over a period of time. Efforts to salvage the corporation's business are usually undertaken and are often maintained beyond the cessation of the corporation's business activities in the hope that those activities can be restarted. The Court does not believe that if those post-mortem efforts prove fruitful and the corporate activities restart, the corporation's principal place of business would have changed during the period of inactivity simply because the efforts were conducted from another location. Likewise, when those effort prove unsuccessful they do not necessarily shift the corporation's final principal place of business. In this case, where Dougherty, the Corporation's only officer, engaged in efforts to obtain financing and to stave off debtors, he was not engaged in the corporation's business. His managerial efforts were designed to salvage the Puerto Rico operations of Caribbean; they were directed both toward potential investors in Puerto Rico and elsewhere, but not specifically New York (Dougherty, in explaining his efforts during that period speaks only of institutions in Puerto Rico and Washington, D.C., Aff. at ¶ 5–20); and during this period, Caribbean still maintained a post office box, numerous contacts, and property in Puerto Rico for carrying on its commercial farming enterprise in Vega Baja. Aff. at ¶ 9. Dougherty's conducting of Caribbean's affairs from New York for approximately 14 months while its operations in Puerto Rico remained inactive is simply insufficient to imbue Caribbean with the character of a New York enterprise. Through the time this suit was filed, to the extent that a lifeless shell retains any locality, Caribbean remained a Puerto Rico enterprise.

### III. CONCLUSION

Based on the foregoing analysis, the Court holds that the parties to this action are not diverse and that the Court therefore has no jurisdiction to hear this case. In light of the Court's lack of jurisdiction, the Plaintiff's Complaint is hereby **DISMISSED WITHOUT PREJUDICE.**

IT IS SO ORDERED, ADJUDGED, AND DECREED.