**AAMAX CORPORATION, Plaintiff,**

v.

**NEW ENGLAND TELEPHONE & TELEGRAPH CO., d/b/a Bell Atlantic, Inc, et al., Defendants.**

**No. Civ.A. 98–12212–REK.**

United States District Court,
D. Massachusetts.

Aug. 18, 1999.

Evan T. Lawson, Christopher N. Cook, Lawson & Weitzen, Boston, MA, for Plaintiff.

Pamela A. Smith, Boston, MA, for Defendants.

Memorandum and Order

KEETON, District Judge.

## I. Jurisdiction

The complaint in this case (Docket No. 1, filed October 29, 1998) asserts that this court has jurisdiction over this civil action by reason of diversity of citizenship. The claims asserted are for commissions or alternative forms of relief related to Location Agreements for Eligible Locations for Bell Atlantic public telephones. Claims are for breach of contract (Count I), quantum meruit (Count II), interference with advantageous relations (Count III), defamation (Count IV), and violation of Mass. Gen.Laws ch. 93A (Count V).

After hearing oral argument at a hearing of July 22, 1999 on pending motions, identified in Part II below, the court determined that a need existed to clarify the facts bearing on diversity jurisdiction and scheduled an evidentiary hearing for this purpose to commence at 9:00 a.m. August 2, 1999.

## II. Pending Matters

Pending before the court are the following submissions:

(1) Defendants' Motion to Dismiss the Complaint (Docket No. 13, filed May 21, 1999) with attached Memorandum in Support (with attachments 1 and 2 and Declaration of Robert Erb) and separately filed Declaration of Robert Erb (Docket No. 14, filed May 25, 1999). Also bearing on this motion are Plaintiff's Opposition (Docket No. 19, filed June 25, 1999) and Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss (Docket No. 27, filed August 9, 1999), and defendant's Supplemental Memorandum in Support of Defendant's Motion to Dismiss the Complaint (Docket No. 24, filed August 2, 1999).

(2) Defendants' Motion for a Protective Order (Docket No. 15, filed May 28, 1999); and

(3) Plaintiff's Motion to Strike the Declaration of Robert Erb (Docket No. 18, filed June 25, 1999), with Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss; Opposition to Defendants' Motion to Amend Its Answer; and Plaintiff's Motion to Strike the Declaration of Robert Erb (Docket No. 20, filed June 25, 1999).

## III. Defendants' Amended Answer

Defendants' Amended Answer (Docket No. 23, filed July 23, 1999) designates the two defendants on whose behalf it is filed as follows:

+ New England Telephone and Telegraph Company d/b/a Bell Atlantic—New England

+ New York Telephone Company d/b/a Bell Atlantic—New York

It alleges that New England Telephone and Telegraph Company was formerly known as (f/k/a) NYNEX and "now d/b/a Bell Atlantic—New England." It alleges further that this entity "is a New York corporation with a principal place of business at 125 High Street, Boston, Massachusetts."

"Defendants further admit that New York Telephone Company, f/k/a NYNEX, now d/b/a Bell Atlantic—New York, is a New York corporation with a usual place of business at 1095 Avenue of Americas, New York, New York."

Defendants further allege that "no entity known as Bell Atlantic, Inc." exists.

All of these allegations appear on page 1 of Docket No. 23. They are part of the "FIRST DEFENSE," which also includes responses to each paragraph of the complaint. At no place in the "FIRST DEFENSE" does any explanation appear as to the theory of the first defense, other than denial of some allegations of the complaint and a repeated assertion that "the

terms of" the Public Telephone Service Master Agreement "speak for themselves."

The "SECOND" through "NINE-TEENTH" defenses are single-sentence boilerplate allegations that in most and perhaps all instances do not comply with requirements of the Federal Rules of Civil Procedure.

## IV. Corporate Citizenship Issues

First Circuit precedent to which I look primarily for guidance in considering the corporate citizenship issues in this case derives substantially from Circuit Judge Levin H. Campbell's opinion for the court in *de Walker v. Pueblo International, Inc.,* 569 F.2d 1169 (1978). The plaintiff-appellee in that case "obtained a $25,000 jury verdict for damages suffered when she was falsely accused of shoplifting at one of Pueblo's stores in San Juan," Puerto Rico. *Id.* at 1170. The only issue presented on appeal was defendant's contention that the district court lacked subject-matter jurisdiction because of lack of diversity of citizenship. The Court of Appeals concluded that the district court lacked jurisdiction, and reversed and remanded with instructions to dismiss the complaint. The following excerpts include passages of the opinion that are most relevant to the issues now before this court:

> Three distinct, but not necessarily inconsistent, tests have been developed for determining where a corporation's "principal place of business" is located. See generally 1 J. Moore, Federal Practice, P 0.77(3) (2d ed.1977). *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862, 865 (S.D.N.Y.1959), established the "nerve center" test, i.e., the center "from which (a multifaceted corporation's) officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective." Later cases have suggested that this inquiry should be limited to a "large corporate enterprise with complex and farflung activities" where only the "nerve center" can actually be termed the "principal place of business." See

*Epstein v. Guilford Industries, Inc.,* 218 F.Supp. 286, 288–89 (S.D.N.Y.1963); *Anderson v. Southern Bell Telephone & Telegraph Co.,* 209 F.Supp. 921, 927 (M.D.Ga.1962). Even were we to assume that Pueblo is the type of corporation for which the "nerve center" test would be most appropriate, we could not say that plaintiff has carried her burden of establishing that Pueblo has its nerve center outside Puerto Rico. From the documents which plaintiff submitted, it does appear that two "executive offices" exist, one in Puerto Rico and the other in New York City. But little more can be gleaned about the New York office. In contrast, Pueblo's Executive Vice Presidents' affidavit stated that,

> "Pueblo, as such corporate entity has its own accounting system, records, operating, purchasing and sales staffs at its (executive offices) at Carolina, Puerto Rico.

> "The Minutes Books of Pueblo and of its predecessor corporation are kept at the above said principal offices of the Corporation....

> "All stock certificates of Pueblo cancelled as a result of transactions in the trading of its common stock ... are kept and stored at the principal offices located at Carolina, Puerto Rico."

The most that can be deduced from this incomplete evidence is that a "nerve center", if one exists, is located in Puerto Rico. Certainly there is nothing to establish that the "nerve center" is in New York.

However, *we need not rest our decision solely on the "nerve center" test,* for under the other inquiries recognized for purposes of s 1332(c) jurisdiction, Pueblo's principal place of business must also be recognized as Puerto Rico. *Kelly v. United States Steel Corp.,* 284 F.2d 850, 854 (3d Cir.1960), *suggested that the "principal place of business" of a corporation is "the center of corporate activity," i.e., where the corporation's day-to-day management takes place.* A some-

what different test focuses on "the locus of the operations of the corporation." *Inland Rubber Corp. v. Triple A Tire Service, Inc.,* 220 F.Supp. 490, 496 (S.D.N.Y.1963). The information before the district court all points to Puerto Rico as *the place where Pueblo's day-to-day management and operations occur.* Plaintiff suggests, however, that because Hills is the wholly owned subsidiary of Pueblo and because Hills is treated as a "division" of Pueblo, we should ignore the separate corporate identities of Hills and Pueblo. If the two were viewed as a single corporation, it is argued, Pueblo's "center of corporate activity" or "locus of . . . operations" would have to be regarded as outside Puerto Rico, since Hills accounts for about 60% Of the combined entity's operations.

*We do not agree that the separate corporate identities of Hills and Pueblo may be ignored.* In determining whether a parent is "doing business" in a state for purposes of personal jurisdiction, the Supreme Court has held that a separately incorporated subsidiary operating in a state ordinarily may not be considered to be the parent for purposes of determining whether the parent is doing business there. [quote omitted] *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 335, 336–37, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925) (Brandeis, J.). Later cases have continued to give effect to the separate corporate identities, suggesting that an exception might be made where parent and subsidiary "violated the integrity of the forms they chose or rendered them unreal by any course of conduct shown in the evidence." *Blount v. Peerless Chemicals (P.R.) Inc.,* 316 F.2d 695, 698 (2d Cir.), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963).

\*     \*     \*     \*     \*     \*

A fortiori, the Cudahy Packing line of cases should apply in a s 1332(c) case. See *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.,* 461 F.2d 1140, 1142 (3d Cir.1972). If the court may not look to the activities of a separately incorporated subsidiary for purposes of determining whether its parent is "doing business" in a state, there is no reason to look to the subsidiary to determine whether the parent has its "principal place of business" in that state. *In the present case, if Hills' activities are put to one side, it is clear that Pueblo's operations are conducted almost exclusively in Puerto Rico.* And there is here no occasion under the standards in Cudahy Packing and its progeny for disregarding or piercing Hills' separate corporate identity. There is no evidence in the record that the corporate forms were ignored. Hills appears to have remained a distinct entity in all respects with both corporations keeping separate books for accounting and tax purposes. Pueblo's presentation of consolidated profit, loss and other calculations to its shareholders in some reports does not detract from the otherwise complete fiscal and operational segregation of the two corporations. The fact that Pueblo owned all of Hills' stock, and the control incident to that ownership, do not justify ignoring the otherwise separate character of the two corporations. We need not go so far as to say that the corporate separation must be shown to be a "sham" or "subterfuge"; here the separation "though perhaps merely formal, was real. It was not pure fiction." Cudahy Packing Co., supra.

*Id.,* 569 F.2d at 1170–73 (underscoring added) (footnotes omitted).

■ The next relevant First Circuit decision in chronological sequence is *Topp v. CompAir Incorporated,* 814 F.2d 830 (1st Cir.1987). *Topp* reaffirms the *de Walker* opinion, holding that the activities of a parent corporation should not be taken into consideration when evaluating the principal place of business of a separate and distinct subsidiary:

Except in rare instances, . . ., the inquiry must be limited to an examination of

the subsidiary's own activities, officers and facilities. This is not to say that, under this limiting rule, it would inevitably be wrong to find that a [subsidiary] organized in Delaware had its nerve center in England, [the location of the parent corporation]. That might occur if the officers who normally managed the corporation, and other indices of management, such a corporate books and minutes, the entity's secretariat, employees, bank accounts, and tax filings, were mainly centered in England.... [S]o long as the entity's corporate form is entitled to credibility, the nerve center test looks for the localized nerve center from which the corporation in issue is directly run.

*Id.* 814 F.2d at 835 (footnotes omitted).

*Topp* goes on to explain the considerations that must be taken into account when determining whether the separation between parent and subsidiary is a real and distinct separation that entitles a subsidiary to be treated as a separate corporate entity:

> In de Walker, ..., we held that the district court had erred in piercing the corporate veil between the parent and subsidiary even though the parent corporation routinely included the subsidiary's figures in its calculations of overall profits, losses, expenses, numbers of employees, real estate, etc. Additionally the minutes of the board of directors' meetings of the parent showed that the affairs of the subsidiary "were routinely the subject of the scrutiny and reports and that the directors participated in such major decisions as the hiring and replacement of [the subsidiary's] president."

*Id.* at 836, quoting *de Walker,* 569 F.2d at 1171.

> The gist of all of plaintiff's arguments is that the federal court should be delving into how many important decisions and functions of a subsidiary are controlled by that subsidiary, and how many were controlled by the parent corporation.

Again, *keeping in mind that the issue here is CompAir Inc.'s [the subsidiary] principal place of business, and recognizing that CompAir Inc. has always held itself out as having accomplished its principal business activity (i.e., providing financial services to its subsidiaries) through its own officers, employees and facilities, we can discern no value in having the federal district courts get mired down in the hopeless and unnecessary task of deciphering the internal power struggles going on between a parent corporation and its subsidiaries.*

*Id.* at 837 (emphasis added).

■ The final First Circuit case upon which I rely is *Taber Partners, I v. Merit Builders, Inc.,* 987 F.2d 57 (1st Cir.1993). *Taber* again affirms both *de Walker* and *Topp,* holding that a corporation's principal place of business must be determined by looking at the business activities of the corporation whose principal place of business is at issue, unless the parent and subsidiary have ignored their separate identities:

> [W]e have repeatedly held that, where there is no evidence that the integrity of the corporate form has been violated, the separate corporate identities of a parent and subsidiary should be honored when determining either one's principal place of business. *See U.S.I. Properties,* 860 F.2d at 7 (recognizing separate corporate identity of subsidiary *despite evidence that subsidiary was wholly-owned by "grandparent" corporation, shared all its officers and directors with grandparent, was grossly undercapitalized, and did not prepare its own budget, construction requirements, or policies and procedures* ); ... *Topp,* 814 F.2d at 833 (recognizing separate corporate identity of subsidiary holding company *despite evidence that it could not act without the express permission of its parent, and that its sole function was to serve as financial conduit for parent* ); ... *de Walker,* 569 F.2d at 1173 (recog-

nizing separate corporate identity of parent *despite evidence that parent consolidated its profits and losses with that of its wholly-owned subsidiary in presenting parent's financial reports to shareholders, that subsidiary was considered a "division" of parent, and that subsidiary accounted for 60% of parent's and subsidiary's combined operations* ).

See *Taber*, 987 F.2d at 61 (emphasis added).

The court goes on to determine principal place of business based on the location of "the day-to-day management of Taber," combining both the "nerve center" test and the "center of corporate activity" test, and noting that because the corporation at issue had no physical operations, the "locus of the operations of the corporation" test would not be helpful. *See id.* at 63, n. 7.

### V. Motion to Dismiss

### A. NETT as Separate Corporate Entity

In the present case, defendants' lack of full and forthright disclosure to the plaintiff and to the court of the true ongoing and developmental relationship among the various legal entities identified in their Answer, together with the contentious relationships among parties and counsel about how depositions might proceed if allowed, led me to order the evidentiary hearing in which evidence was received in court under judicial supervision.

Having considered the evidence received after the opportunity allowed to all parties to conduct discovery in court of reasonable and fair scope, I conclude that, guided by the opinion in *de Walker* and later cases citing it, the decision in this case need not and should not rest solely on the "nerve center" test and is more appropriately made on a totality-of-circumstances basis that involves weighing of factors to consider whether the heavier weight is on the side of a determination of entity citizenship in Massachusetts thereby defeating plaintiff's claim that defendants' New York citizenship supports diversity jurisdiction in

this court. The "nerve center" test alone, properly applied to the circumstances of this case, probably supports this outcome. This outcome is more strongly supported by the totality-of-the circumstances test.

██ It is well-established that unless the line between a parent and a subsidiary corporation is false or indistinguishable the determination of the principal place of business of a subsidiary turns on the activities and operation of the subsidiary alone, not on those of the parent corporation. In this case, New England Telephone and Telegraph Company ("NETT") is not overly dominated or intermingled with Bell Atlantic Corporation ("BA") so as to be void of its separate existence for the purposes of this inquiry.

The overall policy for BA and its nine subsidiaries is created by BA, and some of the officers of NETT are also officers of BA. In light of the *de Walker*, *Topp* and *Taber* opinions quoted above, however, the facts as a whole in this case, do not unacceptably blur the line between parent and subsidiary. It is evident that the principal and daily business activities of NETT were executed through its own officers, employees, and substantially from its office in Boston, Massachusetts. In addition, NETT is separately incorporated from BA. Thus, in evaluating NETT's principal place of business, it is appropriate to focus on the activities and operations of NETT, without also looking to those of BA.

### B. NETT's Principal Place of Business

██ NETT has shown that its corporate headquarters is in Massachusetts (as evidenced by its SEC Form 10K filing), that it does not have a principal bank account in New York (or any other state due to its having several accounts), that the location of most of the officers and all of the corporate personnel who direct the daily operations of the business is Massachusetts, and that the place where policy decisions are implemented is in Massachusetts.

In addition, of the five New England states serviced by NETT, Massachusetts contains the majority of NETT's employees, the majority of NETT's in-service access lines (generating the majority of its revenue), and the majority of the real property leased and owned by NETT is in Massachusetts. Also, although NETT's tax returns are not filed in Massachusetts, neither are they filed in New York, rather they are consolidated with those of the other subsidiaries and filed in Pennsylvania. As plaintiff has the burden of proving that NETT's principal place of business is in New York, this fact cuts against plaintiff.

Plaintiff argues, on the other hand, that some of the officers and directors of NETT are located in New York and are common to both NETT and BA. In addition, NETT's Board of Directors meetings are in New York and the minutes of those meetings are kept in New York. Moreover, all major policy with respect to the subsidiaries is made at BA in New York and applies equally across all nine subsidiaries.

The determination in this case must be made with respect to not only the general composition of the defendants and BA, but also more specifically in a way that is relevant to the contract issue in dispute here. The contract in dispute is for the placement and management of public telephones at certain locations. This involves the day-to-day operations of both plaintiff and defendants. Plaintiff argues that it fulfilled its obligations but was never paid by defendants. Although it is true that overall BA policy would affect any contract with NETT, the management and implementation of those policies is effectuated by NETT in Massachusetts, as is the implementation of any contract, and this contract specifically, with respect to NETT. *See Topp*, 814 F.2d at 838.

Evaluating the totality of all of the evidence now before me, I conclude that plaintiff has failed to meet plaintiff's burden of showing that the principal place of business with respect to this contract and with respect to regulatory proceedings is in New York. Defendants' Motion to Dismiss will be ALLOWED.

## VI. Other Pending Motions

Defendants' Motion for a Protective Order will be DISMISSED AS MOOT. Plaintiff's Motion to Strike the Declaration of Robert Erb will be DISMISSED AS MOOT as it was not relied upon in the above analysis.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendants' Motion to Dismiss the Complaint (Docket No. 13, filed May 21, 1999) is ALLOWED.

(2) Defendants' Motion for a Protective Order (Docket No. 15, filed May 28, 1999) is DISMISSED AS MOOT.

(3) Plaintiff's Motion to Strike the Declaration of Robert Erb (Docket No. 18, filed June 25, 1999) is DISMISSED AS MOOT.

(4) This civil action is DISMISSED for lack of subject matter jurisdiction.

(5) The clerk is directed forthwith to enter on a separate document a Final Judgment as follows:

For the reasons stated in the Memorandum and Order of this date, it is ORDERED:

This civil action is DISMISSED.